**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
**GRAND JURY N-05-04**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. ____________** | |
| | : | | |
| **v.** | : | **VIOLATIONS:** | |
| | : | | |
| **MATTHEW IANNIELLO** | : | **18 U.S.C. § 1962(c)** | **(Racketeering)** |
| **JAMES GALANTE** | : | **18 U.S.C. § 1962(d)** | **(RICO Conspiracy)** |
| **THOMAS MILO** | : | **18 U.S.C. § 1951** | **(Hobbs Act Extortion)** |
| **CHRISTOPHER RAYNER** | : | **18 U.S.C. § 1341** | **(Mail Fraud)** |
| **RICHARD GALIETTI** | : | **18 U.S.C. § 1343** | **(Wire Fraud)** |
| **CIRO VIENTO** | : | **18 U.S.C. § 1349** | **(Attempt & Conspiracy to** |
| **RICHARD CACCAVALE** | : | | **Commit Mail and Wire** |
| **JOSEPH SANTOPIETRO** | : | | **Fraud)** |
| **PAUL DINARDO** | : | **18 U.S.C. § 1512(b)** | **(Witness Tampering)** |
| **ERIC ROMANDI** | : | **18 U.S.C. § 1030(a)(2)** | **(Misuse of Computer)** |
| **TIMOTHY ARCIOLA** | : | **18 U.S.C. § 2232(a)** | **(Interference with Search** |
| **DENNIS BOZZUTO** | : | | **Warrants)** |
| **JASON MANAFORT** | : | **18 U.S.C. § 2232(d)** | **(Interference with Electronic** |
| **JEREMY EVERETT** | : | | **Surveillance)** |
| **ALAN FERRARO** | : | **18 U.S.C. § 1001** | **(False Statement)** |
| **DAVID MAGEL** | : | **18 U.S.C. § 371** | **(Conspiracy)** |
| **SCOTT McGOWAN** | : | **26 U.S.C. § 7201** | **(Tax Evasion)** |
| **GARY MUELLER** | : | **26 U.S.C. § 7206(1)** | **(False Statement on Tax** |
| **ANTHONY NOVELLA III** | : | | **Filing)** |
| **ARTHUR WALLINGER** | : | **26 U.S.C. § 7206(2)** | **(Aiding or Assisting)** |
| **JOSEPH LOSTOCCO** | : | **31 U.S.C. § 5324(a)** | **(Structuring Financial** |
| **RONALD ZOLLO** | : | | **Transactions)** |
| **PHILIP ARMETTA** | : | **18 U.S.C. § 1963** | **(Criminal Forfeiture)** |
| **PAUL GALIETTI** | : | | |
| **LOUIS ANGIOLETTI** | : | | |
| **CARMINE DOMINICUS** | : | | |
| **LISA HENRY** | : | | |
| **ANNA PRISKIE** | : | | |
| **J. TODD STIRLING** | : | | |
| **AUTOMATED WASTE DISPOSAL, INC.** | : | | |
| **DIVERSIFIED WASTE DISPOSAL, INC.** | : | | |
| **SUPERIOR WASTE DISPOSAL, INC.** | : | | |
| **JAT TRUCK REPAIR SERVICE, INC.** | : | | |
| **TRASHERS, LLC** | : | | |
| **530 MAIN STREET NORTH CORP** | : | | |
| **d.b.a. Nutmeg Investments** | : | | |
| **DANBURY CARTING COMPANY, INC.** | : | | |

**TRANSFER SYSTEMS, INC. :**
**ADVANCED RECYCLING CORP. :**
**THOMAS' REFUSE SERVICES, INC. :**

## INDICTMENT

The Grand Jury charges:

### General Allegations

1. At times material to the charges contained in this Indictment, in the District of Connecticut and elsewhere:

a. **MATTHEW IANNIELLO**, also known as "Matty", "The Horse", "Grandpa", and "Long Island", has been a high ranking member of an organization known as the Genovese Family of La Cosa Nostra ("LCN");

b. **JAMES GALANTE** has been the owner of numerous trash hauling entities and related companies headquartered primarily in Danbury, Connecticut, at 307 White Street;

c. **THOMAS MILO** has been **JAMES GALANTE's** partner in the carting industry, an associate of the Genovese Organized Crime Family, and married to Co-Owner A, who is listed as a part owner of many of **JAMES GALANTE'S** companies;

d. **CHRISTOPHER RAYNER** has owned and operated Rayner & Associates, an accounting firm, and has provided accounting services to **JAMES GALANTE, THOMAS MILO** and others associated with the enterprise described herein, including but not limited to those companies and entities listed below in Paragraph 2;

e. **RICHARD GALIETTI** was employed by **JAMES GALANTE** as his sales manager, until he left **JAMES GALANTE**'s employ in approximately August 2005;

f. **CIRO VIENTO** has been employed by **JAMES GALANTE** as his operations

manager and, moreover, is listed as an officer in many of **JAMES GALANTE's** companies;

g. **RICHARD CACCAVALE** has been employed by **JAMES GALANTE** as a "roll-off/residential" manager in relation to several trash hauling companies;

h. **PAUL GALIETTI**, the cousin of **RICHARD GALIETTI**, has been a Trooper employed by the Connecticut State Police;

i. **JOSEPH SANTOPIETRO** has been a consultant of **JAMES GALANTE**, serving as a representative of **JAMES GALANTE's** trash-related interests in the Waterbury, Connecticut area;

j. **PAUL DINARDO** has been employed by **JAMES GALANTE** for many years, leaving in or about 2003 and returning in 2005, approximately, to become the manager of American Disposal Service (hereafter "ADS") in Seymour, Connecticut;

k. **ERIC ROMANDI** has been and is currently employed by **JAMES GALANTE**;

l. **TIMOTHY ARCIOLA** has been employed as a salesperson for **JAMES GALANTE**, working directly for **RICHARD GALIETTI**;

m. **DENNIS BOZZUTO** has been an owner and operator of John's Refuse, a carting company located in Northford, Connecticut;

n. **JASON MANAFORT** has been an owner and operator of CWPM, a carting company located in Plainville, Connecticut;

o. **JEREMY EVERETT** has been the sales manager at Allied Waste, a carting company that, among other things, operates the Westchester County Transfer Station in Mt. Kisco, New York;

p. **ALAN FERRARO** has been an owner and operator of Tri-County Disposal, a carting

company located in Brewster, New York;

q. **DAVID MAGEL** has been the General Manager at CRP Carting, a carting company located in Elmsford, New York;

r. **SCOTT MCGOWAN** has been employed by Allied Waste as the site manager at the Westchester County Transfer Station in Mt. Kisco, New York;

s. **GARY MUELLER** has been employed by **ALAN FERRARO** at Tri-County Disposal;

t. **ANTHONY NOVELLA III** was an owner/operator of A.J. Novella Sanitation, a carting company located in Danbury, Connecticut, that was purchased by **JAMES GALANTE** in approximately May 2005;

u. **JOSEPH LOSTOCCO**, also known as "Fat Joe", has been an owner and operator of Lostocco Services, a carting company located in Danbury, Connecticut;

v. **LOUIS ANGIOLETTI** has been a special agent employed by the Drug Enforcement Administration;

w. **PHILIP ARMETTA** has been an owner and operator of Dainty Rubbish, a carting company located in Middletown, Connecticut;

x. **ARTHUR WALLINGER** has been an owner and operator of AJ Waste Systems, a carting company located in Cheshire, Connecticut;

y. **RONALD ZOLLO** is controller for **AWD**, **SWD**, **DWD**, **TSI**, **ARC** and **530 MAIN STREET;**.

z. **LISA HENRY** resides at 530 Main Street North in Southbury, Connecticut;

aa. **ANNA PRISKIE** and **CARMINE DOMINICUS** are the daughter and son-in-law,

respectively, of **THOMAS MILO;** and

bb. **J. TODD STIRLING** was the coach of the Danbury Trashers in the 2004-2005 season.

2. At times material to the charges contained in this Indictment:

a. **AUTOMATED WASTE DISPOSAL INC**. (hereafter "**AWD**"), **DIVERSIFIED WASTE DISPOSAL INC**. (hereafter **"DWD**") and **SUPERIOR WASTE DISPOSAL, INC**. (hereafter "**SWD**") were trash hauling companies doing business principally at 307 White Street, Danbury, Connecticut;

b. **AWD, DWD, SWD** and their subsidiaries are owned by **JAMES GALANTE, THOMAS MILO** and a person not now in this indictment, hereinafter referred to as Co-Owner A;

c. **AWD** is a company affiliated with **JAT TRUCK REPAIR, INC**. (hereafter "**JAT**"), F&H Sanitation, and the **TRASHERS, LLC** (hereafter **"the DANBURY TRASHERS**"), a minor league hockey team;

d. **SWD** is the parent company for **DANBURY CARTING COMPANY, INC**. (hereafter "**DCC**") and **THOMAS' REFUSE SERVICES, INC.** (hereafter "**THOMAS REFUSE**"), which are also trash hauling companies owned by **JAMES GALANTE** and Co-Owner A;

e. **TRANSFER SYSTEMS INC**. (hereafter "**TSI**") is a company owned by **JAMES GALANTE** and does business principally at 307 White Street, Danbury, Connecticut;

f. **ADVANCED RECYCLING CORPORATION** (hereafter "**ARC**") is a recycling company owned by **JAMES GALANTE** and Co-Owner A and does business principally at 307

White Street, Danbury, Connecticut;

g. **530 MAIN STREET NORTH CORPORATION**, d.b.a. Nutmeg Investments (hereafter "**530 MAIN STREET**") is a company controlled by **JAMES GALANTE**; the principal asset of this company being a residential house located at 530 Main Street North in Southbury, Connecticut, occupied by the defendant **LISA HENRY**;

## COUNT ONE: RACKETEERING
18 U.S.C. §§ 1962(c) & 2

### The LCN and the "Property Rights System"

3. Since the 1960's, in New York City, Long Island, and the New York metropolitan area, including Connecticut, garbage haulers, also known as carters, affiliated with certain organized crime groups have asserted without legal justification that they have a permanent "property right" to every "stop" that they collect. Under this property rights system, these "stops" – primarily commercial and residential accounts – remain with the controlling carter for as long as that carter is in business, regardless of whether the particular customer sells to a successor entity.

4. In short, the property rights system dictates that participating carters will "respect" a fellow carter's claim to an account, either by not competing for that work or, when solicited by the customer, by declining to pursue the opportunity or bidding at a pre-arranged price designed to lose the contract.

5. The property rights system has, from time to time, been extended to apply to contracts to operate transfer stations.

6. The property rights system has been enforced by the Gambino and Genovese Organized Crime Families of the LCN, whose members back certain carters and, in exchange, receive

"tribute" payments, also known as a "mob tax," which represents a portion of the participating carters' profits.

7. LCN backing includes support in dispute resolution, and allows connected carters to intimidate other participating and non-participating carting companies.

8. Carting companies that have "bucked the system" by competing and attempting to compete in an area for work have faced threats of economic and physical reprisal, including but not limited to:

a. Having drivers and other employees assaulted;

b. Having equipment vandalized or otherwise damaged;

c. Being subjected to predatory pricing and other economic sanctions;

d. Being locked out of or otherwise subjected to restricted access to transfer stations and other dumping facilities; and

e. Being forced to pay compensation by giving back stops or paying restitution.

9. Participating carters are also pressured to not sell to large, national companies.

10. The property rights system is in effect in Connecticut, and has been so since at least the mid-1980's.

11. One of the effects of the property rights system has been to stifle competition by preventing small, independent companies from competing against companies affiliated with the LCN and by preventing free competition for waste hauling and related services. The lack of competition and free enterprise, in turn, harms consumers who are forced to pay inflated prices for the carters' services.

**The Racketeering Enterprise**

12. At all times material to this Indictment, in the District of Connecticut and elsewhere, defendants **MATTHEW IANNIELLO, JAMES GALANTE, THOMAS MILO, CHRISTOPHER RAYNER, RICHARD GALIETTI, CIRO VIENTO, RICHARD CACCAVALE, JOSEPH SANTOPIETRO, PAUL DINARDO, ERIC ROMANDI, TIMOTHY ARCIOLA, DENNIS BOZZUTO, JASON MANAFORT, JEREMY EVERETT, ALAN FERRARO, DAVID MAGEL, SCOTT MCGOWAN, GARY MUELLER, ANTHONY NOVELLA III, ARTHUR WALLINGER, AWD, DWD, SWD**, and other entities, to wit, John's Refuse, AJ Waste System, and Tri-County Disposal, and others known and unknown to the Grand Jury, constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals, partnerships, corporations, and other legal entities associated in fact. This enterprise, which operated in the District of Connecticut and elsewhere, was engaged in, and its activities affected, interstate commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

**Purpose of the Enterprise**

13. The purposes of the enterprise included the following:

a. Enriching the members and associates of the enterprise through, among other things, extortion, fraud, bribery, money laundering and witness tampering/obstructing justice;

b. Preserving and protecting the power, territory and profits of the enterprise through the use of intimidation, violence, threats of violence, and assaults, as well as the imposition of economic sanctions including but not limited to predatory pricing, limited access to transfer stations, and the threat of having to defend against costly and frivolous litigation;

c. Promoting and enhancing the enterprise and its members' and associates' activities;

and

d. Keeping victims in fear of the enterprise and in fear of its members and associates through threats of violence and economic sanctions, including but not limited to predatory pricing, limited access to transfer stations, and the threat of having to defend against frivolous litigation.

**Manner and Means Used by the Enterprise**

14. Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the enterprise were the following:

a. Members of the enterprise and their associates used, attempted to use, and conspired to use extortion, which affected interstate commerce;

b. Members of the enterprise and their associates committed, attempted and threatened to commit acts of violence to protect and expand the enterprise's criminal operations;

c. Members of the enterprise and their associates promoted a climate of fear through violence, threats of violence, economic sanctions and threats of economic sanctions;

d. Members of the enterprise and their associates used and threatened to use physical violence against various individuals and/or their property and equipment;

e. Members of the enterprise and their associates committed and attempted to bribe or otherwise induce law enforcement officials to: run license plate registrations in order to determine whether competing carters were cooperating with law enforcement; access restricted police computer data bases to ascertain whether the enterprise, its members or associates were being investigated by law enforcement; and determine whether a certain individual was actually an undercover law enforcement officer; and otherwise abuse their lawful authority and harass competing carters by stopping their trucks and by issuing motor vehicle infractions;

f. Members of the enterprise and their associates also tampered with witnesses summoned to appear before a federal grand jury to prevent those witnesses from providing truthful and complete testimony;

g. Members of the enterprise and their associates assumed the identity of a salesperson from another company, with that company's authorization and consent, and quoted excessively deflated market prices to customers then being serviced by a carter not participating in the property rights system;

h. Members of the enterprise and their associates denied non-participating carters access

to transfer stations;

i. Members of the enterprise and their associates defrauded consumers by using multiple business cards and posing as competing salespersons, when in fact these persons were all affiliated within the same corporate structure and privy to the price quotes being made to the unwary consumer; and

j. Members of the enterprise and their associates acted to squelch competition and deceive customers into believing that there is competition in the market, and thereby artificially control prices, inflate prices, and leave customers with no choice but to pay inflated prices.

## The Racketeering Violation

15. Beginning in or about 1990, approximately, and continuing to on or about the date this indictment is returned, the exact dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI, CIRO VIENTO, AWD** and **DWD**, together with others known and unknown to the Grand Jury, being persons associated with and employed by the enterprise identified herein, an enterprise engaged in, and the activities of which affected, interstate commerce, did knowingly and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, that is, through the commission of Racketeering Acts One through Twelve as set forth below. The defendants participated in the operation and management of the enterprise.

## The Pattern of Racketeering Activity

16. The pattern of racketeering activity, as that term is defined by Title 18, United States Code, §§ 1961(1) and 1961(5), consisted of the following acts:

## A. INTERFERENCE WITH INTERSTATE COMMERCE BY EXTORTION

**Racketeering Act 1: Extortion and Conspiracy to Extort Company A**

17. The defendants named below committed the following acts, either of which alone constitutes the commission of Racketeering Act 1:

**Racketeering Act 1A: Extortion of Company A**

18. In or about the autumn of 2004, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI** and **DWD**, together with others known and unknown, unlawfully and knowingly attempted to and did commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), by taking and obtaining property, to wit: money, contractual rights and business opportunities, including but not limited to the right to solicit contracts and the fees paid by customers desiring services relating to the collection and hauling away of garbage, from and with the consent of the owners, officers, employees and agents of Company A, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. §§ 1951 and 2.

**Racketeering Act 1B: Conspiracy to Extort Company A**

19. In or about the autumn of 2004, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI** and **DWD**, together with others known and unknown, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), that is to take and obtain property, to wit: money, contractual rights and business

opportunities, including but not limited to the right to solicit contracts and the fees paid by customers desiring services relating to the collection and hauling away of garbage, from and with the consent of the owners, officers, employees and agents of Company A, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. § 1951.

**Racketeering Act 2: Extortion and Conspiracy to Extort Company B**

20. The defendants named below committed the following acts, either of which alone constitutes the commission of Racketeering Act 2:

**Racketeering Act 2A: Extortion of Company B**

21. In or about April and May 2005, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI, CIRO VIENTO** and **DWD**, and Richard Caccavale, who is not a defendant in Count One, together with others known and unknown, unlawfully and knowingly attempted to and did commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), by taking and obtaining property, to wit: money, contractual rights and business opportunities, including but not limited to the right to solicit contracts and the fees paid by customers desiring services relating to the collection and hauling away of garbage, from and with the consent of the owners, officers, employees and agents of Company B, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in

violation of 18 U.S.C. §§ 1951 and 2.

**Racketeering Act 2B: Conspiracy to Extort Company B**

22. In or about April and May 2005, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI, CIRO VIENTO,** and **DWD**, and Richard Caccavale, who is not a defendant in Count One, together with others known and unknown, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), that is to take and obtain property, to wit: money, contractual rights and business opportunities, including but not limited to the right to solicit contracts and the fees paid by customers desiring services relating to the collection and hauling away of garbage, from and with the consent of the owners and operators of Company B, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. § 1951.

**Racketeering Act 3: Extortion and Conspiracy to Extort Company C**

23. The defendants named below committed the following acts, either of which alone constitutes the commission of Racketeering Act 3:

**Racketeering Act 3A: Extortion of Company C**

24. In or about January through December 2004, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI,** and **CIRO VIENTO**, and Scott McGowan and Jason Manafort, who are not defendants in Count One, together with others known and unknown, unlawfully and knowingly attempted to and did commit extortion, as

that term is defined in 18 U.S.C. § 1951(b)(2), by taking and obtaining property, to wit: money, contractual rights and business opportunities, including but not limited to the right to solicit contracts and the fees paid by customers desiring services relating to the collection and hauling away of garbage, from and with the consent of the owners, officers, employees and agents of Company C, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. §§ 1951 and 2.

**Racketeering Act 3B: Conspiracy to Extort Company C**

25. In or about January through December 2004, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI,** and **CIRO VIENTO**, and Scott McGowan and Jason Manafort, who are not defendants in Count One, together with others known and unknown, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), that is to take and obtain property, to wit: money, contractual rights and business opportunities, including but not limited to the right to solicit contracts and the fees paid by customers desiring services relating to the collection and hauling away of garbage, from and with the consent of the owners and operators of Company C, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. § 1951.

**Racketeering Act 4: Extortion and Conspiracy to Extort Customer A**

26. The defendants named below committed the following acts, either of which alone constitutes the commission of Racketeering Act 4:

**Racketeering Act 4A: Extortion of Customer A**

27. In or about October 2004 through in or about January 2005, in the District of Connecticut and elsewhere, the defendant **RICHARD GALIETTI**, and Anthony Novella III, who is not a defendant in Count One, together with others known and unknown, unlawfully and knowingly attempted to and did commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), by taking and obtaining property, to wit: money, contractual rights, including but not limited to the right to contract with the refuse hauling provider of its choice and business opportunities, from and with the consent of the owners, officers, employees and agents of Customer A, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. §§ 1951 and 2.

**Racketeering Act 4B: Conspiracy to Extort Customer A**

28. In or about October 2004 through in or about January 2005, in the District of Connecticut and elsewhere, the defendant **RICHARD GALIETTI**, and Anthony Novella III, who is not a defendant in Count One, together with others known and unknown, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), that is to take and obtain property, to wit: money, contractual rights, including but not limited to the right to contract with

the refuse hauling provider of its choice and business opportunities, from and with the consent of the owner and operator of Customer A, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. § 1951.

**Racketeering Act 5: Extortion and Conspiracy to Extort Customer B**

29. The defendants named below committed the following acts, either of which alone constitutes the commission of Racketeering Act 5:

**Racketeering Act 5A: Extortion of Customer B**

30. In or about September 2004, in the District of Connecticut and elsewhere, the defendant **RICHARD GALIETTI**, together with others known and unknown, unlawfully and knowingly attempted to and did commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), by taking and obtaining property, to wit: money, contractual rights, including but not limited to the right to contract with the refuse hauling provider of its choice and business opportunities, from and with the consent of the owners, officers, employees and agents of Customer B, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. §§ 1951 and 2.

**Racketeering Act 5B: Conspiracy to Extort Customer B**

31. In or about September 2004, in the District of Connecticut and elsewhere, the defendant **RICHARD GALIETTI**, together with others known and unknown, unlawfully and knowingly

attempted to and did commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), that is to obtain property, to wit: money, contractual rights, including but not limited to the right to contract with the refuse hauling provider of its choice and business opportunities, from and with the consent of the owners, officers, employees and agents of Customer B, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. §§ 1951.

**B. MAIL AND WIRE FRAUD**

**Racketeering Act 6: Mail Fraud – Customer C**

32. The defendants named below committed the following acts, any one of which alone constitutes the commission of Racketeering Act 6:

33. From in or about July 2004, up to and including September 2005, in the District of Connecticut and elsewhere, **JAMES GALANTE, RICHARD GALIETTI** and **DWD** and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of material false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting to do so, did place in a post office and authorized depository for mail matter a matter and thing to be sent and delivered by the United States Postal Service, that is monthly invoices for refuse, bulk waste & recyclable disposal services and did take and receive therefrom, such matter and thing, and did cause such matter and thing to be delivered by mail according to the direction thereon, and at the place at which it was

directed to be delivered by the person to whom it was addressed, to wit, the defendants and others fraudulently obtained inflated payments for trash removal services by falsely claiming to have submitted a competitive pricing structure devoid of collusion, during the course of which scheme employees of **DWD** mailed regular invoices, on or about the dates listed below, to Customer C and in turn received payments, in violation of 18 U.S.C. §§ 1341 and 2:

| **Racketeering Act** | **Date** | **Use of United States Mail** |
|---|---|---|
| 6A | 9/30/04 | Invoice No. 24A08810<br>Invoice No. 24A08811<br>Invoice No. 24A08815 |
| 6B | 11/30/04 | Invoice No. 24A11784 |
| 6C | 12/31/04 | Invoice No. 24A13223<br>Invoice No. 24A13224<br>Invoice No. 24A13228 |
| 6D | 1/31/05 | Invoice No. 24A14686<br>Invoice No. 24A14682<br>Invoice No. 24A14681 |
| 6E | 2/28/05 | Invoice No. 24A16130<br>Invoice No. 24A16131<br>Invoice No. 24A16135 |
| 6F | 3/31/05 | Invoice No. 24A17592<br>Invoice No. 24A17591 |
| 6G | 4/30/05 | Invoice No. 24A19070<br>Invoice No. 24A19076<br>Invoice No. 24A19072<br>Invoice No. 24A19071 |
| 6H | 5/31/05 | Invoice No. 24A20536<br>Invoice No. 24A20540<br>Invoice No. 24A20535 |
| 6I | 6/30/05 | Invoice No. 24A22016 |

| | | |
|---|---|---|
| | | Invoice No. 24A22017<br>Invoice No. 24A22021 |
| 6J | 7/31/05 | Invoice No. 24A23486<br>Invoice No. 24A23485 |
| 6K | 8/31/05 | Invoice No. 24A24951<br>Invoice No. 24A24946<br>Invoice No. 24A24945 |

**Racketeering Act 7: Mail Fraud – Customer D**

34. The defendants named below committed the following acts, any one of which alone constitutes the commission of Racketeering Act 7:

**Mail Fraud (Racketeering Acts 7A -7L)**

35. From in or about August 2004, up to and including September 2005, in the District of Connecticut and elsewhere, **JAMES GALANTE, RICHARD GALIETTI** and **AWD**, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of material false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting to do so, did place in a post office and authorized depository for mail matter a matter and thing to be sent and delivered by the United States Postal Service, that is monthly invoices for rubbish and recycling removal services and did take and receive therefrom, such matter and thing, and did cause such matter and thing to be delivered by mail according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, to wit, the defendants and others fraudulently obtained inflated payments for trash removal services by falsely claiming to have

submitted a competitive pricing structure devoid of collusion, when in truth and fact the defendants had directed another competitor to submit a higher bid, during the course of which scheme employees of **AWD** mailed regular invoices, on or about the dates listed below, to Customer D and in turn received payments, in violation of 18 U.S.C. §§ 1341 and 2:

| Racketeering Act | Date | Use of United States Mail |
|---|---|---|
| 7A | 9/30/04 | Invoice No. 93H56146 |
| 7B | 10/31/04 | Invoice No. 93H57316 |
| 7C | 11/30/04 | Invoice No. 93H58479 |
| 7D | 12/31/04 | Invoice No. 93H9624 |
| 7E | 1/31/05 | Invoice No. 93H60750 |
| 7F | 2/28/05 | Invoice No. 93H61876 |
| 7G | 3/31/05 | Invoice No. 93H62991 |
| 7H | 4/30/05 | Invoice No. 93H64151B |
| 7I | 5/31/05 | Invoice No. 93H65332<br>Invoice No. 93H65331 |
| 7J | 6/30/05 | Invoice No. 93H66517 |
| 7K | 7/31/05 | Invoice No. 93H67685 |
| 7L | 8/31/05 | Invoice No. 93H68858 |

**Wire Fraud (Racketeering Acts 7M - 7N)**

36. On or about the following dates, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI** and **AWD,** for the purpose of executing the scheme and artifice described above, did transmit and cause to be transmitted in

interstate commerce, by means of a wire communication, certain sounds, that is telephone conversations coordinating the plan to have a competing company pull its bid for Customer D's contract for rubbish removal services and substitute a higher, non-competitive bid, in violation of 18 U.S.C. §§ 1343 and 2, either wire communication constituting the commission of Racketeering Act 7:

| **Racketeering Act** | **Date/Time** | **Interstate Telephone Call** |
|---|---|---|
| 7M | 8/16/04<br>7:21 p.m. | Galietti (in New York) calls<br>Galante (in Connecticut) |
| 7N | 8/16/04<br>7:33 p.m. | Galietti (in New York) calls<br>Undercover Agent (in Connecticut) |

**Extortion (Racketeering Acts 7O & 7P)**

37. The defendants named below committed the following acts, either of which alone constitutes the commission of Racketeering Act 7:

**Racketeering Act 7O: Extortion of Company D**

38. On or about August 16, 2004, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI** and **AWD,** together with others known and unknown, unlawfully and knowingly attempted to and did commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), by taking and obtaining property, to wit: money, contractual rights, including but not limited to the right to contract with the refuse hauling provider of its choice and business opportunities, from and with the consent of the owners, officers, employees and agents of Company D, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement

of articles and commodities in commerce, in violation of 18 U.S.C. §§ 1951 and 2.

**Racketeering Act 7P: Conspiracy to Extort Company D**

39. On or about August 16, 2004, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI**, and **AWD**, together with others known and unknown, unlawfully and knowingly attempted to and did commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), that is to obtain property, to wit: money, contractual rights, including but not limited to the right to contract with the refuse hauling provider of its choice and business opportunities, from and with the consent of the owners, officers, employees and agents of Company D, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. §§ 1951.

**Racketeering Act 8: Mail Fraud – Customer E**

40. The defendants named below committed the following acts, any one of which alone constitutes the commission of Racketeering Act 8:

41. From in or about January 2005, and continuing to on or about the date of this indictment, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI,** and **DWD,** and Paul DiNardo and Jeremy Everett, who are not named as defendants in Count One, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of material false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and

attempting to do so, did place in a post office and authorized depository for mail matter a matter and thing to be sent and delivered by the United States Postal Service, that is monthly invoices for garbage disposal services, and did take and receive therefrom, such matter and thing, and did cause such matter and thing to be delivered by mail according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, to wit, the defendants and others fraudulently obtained inflated payments for trash removal services by having falsely represented and claimed that the bids submitted were not the product of collusion and that the bids were the product of fair and open bidding by arms length competitors whereas in truth and fact the bids submitted by the defendants were the product of collusion, during the course of which scheme employees of **DWD** mailed regular invoices, on or about the dates listed below, to Customer E and in turn received payments, in violation of 18 U.S.C. §§ 1341 and 2:

| Racketeering Act | Date | Use of United States Mail |
|---|---|---|
| 8A | 7/1/05 | Invoice 92153694 |
| 8B | 8/5/05 | Check 222922 ($13,717.46) |
| 8C | 8/1/05 | Invoice 92153792 |
| 8D | 8/26/05 | Check 223143 ($13,217.46) |
| 8E | 12/1/05 | Invoice 92154185 |
| 8F | 12/21/05 | Check 224852 ($26,434.92) |
| 8G | 1/1/06 | Invoice 92154288 |
| 8H | 2/24/06 | Check 225623 ($14,170.26) |
| 8I | 2/1/06 | Invoice 92157388 |
| 8J | 3/1/06 | Check 225746 ($13,217.46) |
| 8K | 3/1/06 | Invoice 92154488 |
| 8L | 3/23/06 | Check 226048 ($13,217.46) |

**Racketeering Act 9: Wire Fraud – Company E**

42. In or about January 2005, in the District of Connecticut and elsewhere, **JAMES GALANTE, RICHARD GALIETTI, CIRO VIENTO,** and Alan Ferraro and Christopher Rayner, who are not named as defendants in Count One, and others known and unknown, for the purpose of executing a scheme and artifice to defraud Company E of a fair and competitive bid for refuse hauling services, did transmit and cause to be transmitted in interstate commerce, by means of a wire communication, certain sounds, that is a telephone conversation on or about January 28, 2005, between **CIRO VIENTO** in Connecticut and a landfill in located in New York, the conversation concerning whether the representative at said landfill could "snuff" the winning bid, in violation of 18 U.S.C. §§ 1343 and 2.

**C. WITNESS TAMPERING**

**Racketeering Act 10: Witness Tampering**

43. From in or about August 2005, and continuing to the date this indictment is returned, in the District of Connecticut, the defendant **JAMES GALANTE**, and Eric Romandi, who is not a defendant in Count One, and others known and unknown, did knowingly corruptly persuade, and attempt to corruptly persuade, another person, that is, Witness A, with intent (1) to influence, delay and prevent that person's testimony in an official proceeding, that is: the investigation of James Galante and others relative to illegal practices in the trash hauling industry that was being conducted by Grand Jury N-05-04 in New Haven, Connecticut, and (2) to cause and induce Witness A to withhold testimony from said official proceeding, in violation of Title 18, United States Code, Section 1512(b).

## D. BRIBERY

**Racketeering Act 11: Bribery of Law Enforcement Officer A**

44. At all times relevant to this indictment, there was in full force and effect a criminal statute of the State of Connecticut at Conn. Gen. Stat. § 53a-147, which provided:

> A person is guilty of bribery if he promises, offers, confers, or agrees to confer upon a public servant or a person selected to be a public servant any benefit as consideration for the recipient's decision, opinion, recommendation or vote as a public servant or a person selected to be a public servant.

45. At all times relevant to the indictment, Law Enforcement Officer A was a public servant as defined in Conn. Gen. Stat. § 53a-146, which provided that a "Public Servant" is an officer or employee of government, elected or appointed, and any person participating as advisor, consultant or otherwise, paid or unpaid, in performing a governmental function.

46. At all times relevant to the indictment, Conn. Gen. Stat. § 53a-146 provided that "Benefit" meant monetary advantage or anything regarded by the beneficiary as a monetary advantage, including benefit to any person or entity in whose welfare he is interested.

47. From in or about September 2004 to June 2005, in the District of Connecticut and elsewhere, the defendant **JAMES GALANTE, RICHARD GALIETTI** and **AWD**, and others known and unknown**,** did commit an act involving bribery, that is, they offered, conferred and agreed to confer upon a public servant, Law Enforcement Officer A, benefits, that is free garbage removal service/rolloff container and other things of value, as consideration for Law Enforcement Officer A's decision as a public servant to improperly access confidential law enforcement computer data bases, run vehicle registrations, and selectively enforce motor vehicle laws, in violation of Conn. Gen. Stat. § 53a-147.

**Racketeering Act 12: Attempted Bribery of Law Enforcement Officer B**

48. The allegations of paragraphs 44 and 46 are incorporated and re-alleged herein.

49. At all times relevant to the indictment, Law Enforcement Officer B, was a public servant as defined in Conn. Gen. Stat. § 53a-146, which provided that a "Public Servant" is an officer or employee of government, elected or appointed, and any person participating as advisor, consultant or otherwise, paid or unpaid, in performing a governmental function.

50. In or about November and December 2004, in the District of Connecticut and elsewhere, the defendant **RICHARD GALIETTI**, and others known and unknown**,** did commit an act involving bribery, that is, he offered, conferred and agreed to confer upon a public servant, Law Enforcement Officer B, benefits, that is tickets to an NFL football game on December 18, 2004, as consideration for Law Enforcement Officer B's decision as a public servant to selectively enforce motor vehicle laws, in violation of Conn. Gen. Stat. § 53a-147.

All in violation of 18 U.S.C. § 1962(c).

**COUNT TWO: RACKETEERING CONSPIRACY**
18 U.S.C. § 1962(d)

51. The allegations contained in paragraphs 1 through 50 of Count One are re-alleged and incorporated as if fully set forth herein.

52. Between in or about 1990, approximately, and the date of this indictment, in the District of Connecticut and elsewhere, the defendants, **MATTHEW IANNIELLO; JAMES GALANTE; THOMAS MILO; CHRISTOPHER RAYNER; RICHARD GALIETTI; CIRO VIENTO; RICHARD CACCAVALE; JOSEPH SANTOPIETRO; PAUL DINARDO; ERIC ROMANDI; TIMOTHY ARCIOLA; DENNIS BOZZUTO; JASON**

**MANAFORT; JEREMY EVERETT; ALAN FERRARO; DAVID MAGEL; SCOTT McGOWAN; GARY MUELLER; ANTHONY NOVELLA III; ARTHUR WALLINGER; AWD; DWD;** and **SWD**, together with other persons known and unknown, being persons employed by and associated with the enterprise described herein, an enterprise which engaged in, and the activities of which affected, interstate commerce, knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined by 18 U.S.C. §§ 1961(1) and 1961(5), said pattern of racketeering activity consisting of multiple acts:

a. Indictable under 18 U.S.C. § 1951 (Hobbs Act Extortion);

b. Indictable under 18 U.S.C. § 1341 (Mail Fraud);

c. Indictable under 18 U.S.C. § 1343 (Wire Fraud);

d. Indictable under 18 U.S.C. § 1512(b) (Witness Tampering); and

e. Involving bribery chargeable under Connecticut General Statutes, Sections 53a-147 and 53a-148.

53. It was further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

All in violation of 18 U.S.C. § 1962(d).

## COUNT THREE: CONSPIRACY TO EXTORT COMPANY A
18 U.S.C. § 1951

54. In or about the autumn of 2004, in the District of Connecticut, and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI** and **DWD**, together with others known and unknown, unlawfully and knowingly combined, conspired, confederated, and agreed

together and with each other to commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), that is to take and obtain property, to wit: money, contractual rights and business opportunities, including but not limited to the right to solicit contracts and the fees paid by customers desiring services relating to the collection and hauling away of garbage, from and with the consent of the owners, officers, employees and agents of Company A, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. § 1951.

All in violation of 18 U.S.C. § 1951.

## COUNT FOUR: CONSPIRACY TO EXTORT COMPANY B
18 U.S.C. § 1951

55. In or about April and May, 2005, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI, CIRO VIENTO,** and **RICHARD CACCAVALE,** together with others known and unknown, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), that is to take and obtain property, to wit: money, contractual rights and business opportunities, including but not limited to the right to solicit contracts and the fees paid by customers desiring services relating to the collection and hauling away of garbage, from and with the consent of the owners, officers, employees and agents of Company B, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby

obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce, in violation of 18 U.S.C. § 1951.

All in violation of 18 U.S.C. § 1951.

**COUNT FIVE: CONSPIRACY TO EXTORT COMPANY C**
18 U.S.C. § 1951

56. In or about January through December 2004, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI, CIRO VIENTO, SCOTT McGOWAN,** and **JASON MANAFORT**, together with others known and unknown, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), that is to take and obtain property, to wit: money, contractual rights and business opportunities, including but not limited to the right to solicit contracts and the fees paid by customers desiring services relating to the collection and hauling away of garbage, from and with the consent of the owners and operators of Company C, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce.

All in violation of 18 U.S.C. § 1951.

**COUNT SIX: CONSPIRACY TO EXTORT CUSTOMER A**
18 U.S.C. § 1951

57. From in or about October 2004 through in or about January 2005, in the District of Connecticut and elsewhere, the defendants **RICHARD GALIETTI** and **ANTHONY NOVELLA III**, together with others known and unknown, unlawfully and knowingly combined,

conspired, confederated, and agreed together and with each other to commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), in that the defendants and their co-conspirators would and did take and obtain property, to wit: money, contractual rights, including but not limited to the right to contract with the refuse hauling provider of its choice and business opportunities, from and with the consent of the owners, officers, employees and agents of Customer A, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce.

All in violation of 18 U.S.C. § 1951.

**COUNT SEVEN: CONSPIRACY TO EXTORT CUSTOMER B**
18 U.S.C. §§ 1951 & 2

58. In or about September 2004, in the District of Connecticut and elsewhere, the defendant **RICHARD GALIETTI**, together with others known and unknown, unlawfully and knowingly attempted to and did commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), by taking and obtaining property to wit: money, contractual rights, including but not limited to the right to contract with the refuse hauling provider of its choice and business opportunities, from and with the consent of the owners, officers, employees and agents of Customer B, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce.

All in violation of 18 U.S.C. §§ 1951 and 2.

**COUNTS EIGHT to EIGHTEEN: MAIL FRAUD-Customer C**
18 U.S.C. §§ 1341 & 2

59. Paragraph 33 is re-alleged and incorporated by reference as if fully set forth herein.

60. From in or about July 2004, up to and including September 2005, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI**, and **DWD,** and others known and unknown, unlawfully, willfully, and knowingly, devised and participated in a scheme and artifice to defraud and obtain money and property by means of material false and fraudulent pretenses, representations, and promises, in connection with Customer C's refuse hauling contract for August 2004 to August 2005.

61. For the purpose of executing and attempting to execute the scheme and artifice to defraud and obtain money and property from Customer C by means of material false and fraudulent pretenses, representations, and promises, on or about the dates listed below, in the District of Connecticut and elsewhere, the defendants and others did knowingly cause to be placed in an authorized depository for mail matter the following:

| COUNT | DATE | USE OF MAIL |
|---|---|---|
| 8 | 9/30/04 | Invoice Nos. 24A08810, 24A08811 & 24A08815 |
| 9 | 11/30/04 | Invoice No. 24A11784 |
| 10 | 12/31/04 | Invoice No. 24A13223<br>Invoice No. 24A13224<br>Invoice No. 24A13228 |
| 11 | 1/31/05 | Invoice No. 24A14686<br>Invoice No. 24A14682<br>Invoice No. 24A14681 |
| 12 | 2/28/05 | Invoice No. 24A16130 |

| | | |
|---|---|---|
| | | Invoice No. 24A16131<br>Invoice No. 24A16135 |
| 13 | 3/31/05 | Invoice No. 24A17592<br>Invoice No. 24A17591 |
| 14 | 4/30/05 | Invoice No. 24A19070<br>Invoice No. 24A19076<br>Invoice No. 24A19072<br>Invoice No. 24A19071 |
| 15 | 5/31/05 | Invoice No. 24A20536<br>Invoice No. 24A20540<br>Invoice No. 24A20535 |
| 16 | 6/30/05 | Invoice No. 24A22016<br>Invoice No. 24A22017<br>Invoice No. 24A22021 |
| 17 | 7/31/05 | Invoice No. 24A23486<br>Invoice No. 24A23485 |
| 18 | 8/31/05 | Invoice No. 24A24951<br>Invoice No. 24A24946<br>Invoice No. 24A24945 |

In violation of 18 U.S.C. §§ 1341and 2.

**COUNTS NINETEEN to THIRTY: MAIL FRAUD-Customer D**
18 U.S.C. §§ 1341 & 2

62. Paragraph 35 is re-alleged and incorporated by reference as if fully set forth herein.

63. From in or about August 2004, up to and including September 2005, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI**, and **AWD,** and others known and unknown, unlawfully, willfully, and knowingly, devised and participated in a scheme and artifice to defraud and obtain money and property by means of material false and fraudulent pretenses, representations, and promises, in connection with the

contract for refuse hauling services for Customer D for trash removal services commencing in or about August 2004.

64. For the purpose of executing and attempting to execute the scheme and artifice to defraud and obtain money and property from Customer D by means of material false and fraudulent pretenses, representations, and promises, on or about the dates listed below, in the District of Connecticut and elsewhere, the defendants and others did knowingly cause to be placed in an authorized depository for mail matter the following:

| COUNT | DATE | USE OF MAIL |
|---|---|---|
| 19 | 9/30/04 | Invoice No. 93H56146 |
| 20 | 10/31/04 | Invoice No. 93H57316 |
| 21 | 11/30/04 | Invoice No. 93H58479 |
| 22 | 12/31/04 | Invoice No. 93H9624 |
| 23 | 1/31/05 | Invoice No. 93H60750 |
| 24 | 2/28/05 | Invoice No. 93H61876 |
| 25 | 3/31/05 | Invoice No. 93H62991 |
| 26 | 4/30/05 | Invoice No. 93H64151B |
| 27 | 5/31/05 | Invoice No. 93H65332<br>Invoice No. 93H65331 |
| 28 | 6/30/05 | Invoice No. 93H66517 |
| 29 | 7/31/05 | Invoice No. 93H67685 |
| 30 | 8/31/05 | Invoice No. 93H68858 |

In violation of 18 U.S.C. §§ 1341 and 2.

**COUNTS THIRTY ONE & THIRTY TWO: WIRE FRAUD-Customer D**
18 U.S.C. §§ 1343 & 2

65. Paragraph 36 is re-alleged and incorporated by reference as if fully set forth herein.

66. From in or about August 2004, up to and including September 2005, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI**, and **AWD**, and others known and unknown, unlawfully, willfully, and knowingly, devised and participated in a scheme and artifice to defraud and obtain money and property by means of material false and fraudulent pretenses, representations, and promises, in connection with the contract for refuse hauling services for Customer D for trash removal services commencing in about August 2004.

67. For the purpose of executing and attempting to execute the scheme and artifice to defraud and obtain money and property from Customer D by means of material false and fraudulent pretenses, representations, and promises, on or about the dates listed below, in the District of Connecticut and elsewhere, the defendants and others did knowingly transmit and cause to be transmitted in interstate commerce, by means of a wire communication, certain sounds, that is telephone conversations coordinating the plan to have a competing company pull its bid for Customer D's contract for rubbish removal services and substitute a higher, non-competitive bid, on the following dates:

| COUNT | DATE/TIME | INTERSTATE TELEPHONE CALL |
|---|---|---|
| 31 | 8/16/04 at 7:21 pm | Galietti (in NY) calls Galante in Connecticut |
| 32 | 8/16/04 at 7:33 pm | Galietti (in NY) calls Undercover Agent in Connecticut |

In violation of 18 U.S.C. §§ 1343 and 2.

**COUNT THIRTY-THREE: CONSPIRACY TO EXTORT COMPANY D**
18 U.S.C. §§ 1951 and 2

68. Paragraph 39 is re-alleged and incorporated by reference as if fully set forth herein.

69. On or about August 16, 2004, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, RICHARD GALIETTI**, and **AWD,** together with others known and unknown, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), that is to take and obtain property, to wit: money, contractual rights and business opportunities, including but not limited to the right to solicit contracts and the fees paid by customers desiring services relating to the collection and hauling away of garbage, from and with the consent of the owners, officers, employees and agents of Company D, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce.

All in violation of 18 U.S.C. § 1951.

**COUNTS THIRTY-FOUR to FORTY-FIVE: MAIL FRAUD-Customer E**
18 U.S.C. §§ 1341 & 2

70. Paragraph 41 is re-alleged and incorporated by reference as if fully set forth herein.

71. From in or about January 2005, and continuing to the date of this indictment, in the District of Connecticut and elsewhere, the defendants, **JAMES GALANTE, RICHARD GALIETTI, PAUL DINARDO, JEREMY EVERETT** and **DWD**, and others known and unknown, unlawfully, willfully, and knowingly, devised and participated in a scheme and artifice to defraud, and obtain money and property by means of material false and fraudulent pretenses,

representations, and promises, in connection with Customer E's contract for refuse hauling services.

72. For the purpose of executing and attempting to execute the scheme and artifice to defraud and obtain money and property from the Carmel, New York School District by means of material false and fraudulent pretenses, representations, and promises, on or about the dates listed below, in the District of Connecticut and elsewhere, the defendants and others did knowingly cause to be placed in an authorized depository for mail matter the following:

| COUNT | DATE | USE OF MAIL |
|---|---|---|
| 34 | 7/1/05 | Invoice 92153694 |
| 35 | 8/5/05 | Check 222922 ($13,717.46) |
| 36 | 8/1/05 | Invoice 9215372 |
| 37 | 8/26/05 | Check 223143 ($13,217.46) |
| 38 | 12/1/05 | Invoice 92154185 |
| 39 | 12/21/05 | Check 224852 ($26,437.92) |
| 40 | 1/1/06 | Invoice 92157288 |
| 41 | 2/24/06 | Check 225623 ($14,170.26) |
| 42 | 2/1/06 | Invoice 92157388 |
| 43 | 3/1/06 | Check 225746 ($13,217.46) |
| 44 | 3/1/06 | Invoice 9215448 |
| 45 | 3/22/06 | Check 226048 ($13,217.46) |

In violation of 18 U.S.C. §§ 1341 and 2

**COUNT FORTY-SIX: WIRE FRAUD-Company E**
18 U.S.C. §§ 1343 & 2

73. In or about January 2005, approximately, in the District of. Connecticut and elsewhere, the defendants **JAMES GALANTE, ALAN FERRARO, RICHARD GALIETTI, CIRO VIENTO,** and **CHRISTOPHER RAYNER**, and others known and unknown, for the purpose of executing a scheme and artifice to defraud Company E of a fair and competitive bid for refuse hauling services, did transmit and cause to be transmitted in interstate commerce, by means of a wire communication, certain sounds, that is a telephone conversation on or about January 28, 2005, between **CIRO VIENTO** in Connecticut and a representative of a landfill in New York, the conversation concerning whether the representative at said landfill could "snuff" the winning bid.

In violation of 18 U.S.C. §§ 1343 and 2.

**COUNT FORTY-SEVEN (Witness Tampering)**
18 U.S.C. § 1512(b)

74. From or about August 2005, and continuing to the date of this indictment, in the District of Connecticut, the defendants, **JAMES GALANTE** and **ERIC ROMANDI**, did knowingly corruptly persuade, and attempt to corruptly persuade, another person, that is, Witness A, with intent (1) to influence, delay and prevent that person's testimony in an official proceeding, that is: the investigation of James Galante and his businesses that was being conducted by Grand Jury N-05-04 in New Haven, Connecticut and (2) to cause and induce Witness A to withhold testimony from said official proceeding.

All in violation of 18 U.S.C. § 1512(b).

**COUNT FORTY-EIGHT (Witness Tampering)**
18 U.S.C. § 1512(b)

75. In or about April 2006, in the District of Connecticut, **JAMES GALANTE**, the defendant herein, and others known and unknown to the Grand Jury, did knowingly corruptly persuade, and attempt to corruptly persuade, another person, that is, Witness B, with intent (1) to influence, delay and prevent that person's testimony in an official proceeding, that is: the investigation of James Galante and his businesses that was being conducted by Grand Jury N-05-04 in New Haven, Connecticut and (2) to cause and induce Witness B to withhold testimony from said official proceeding.

All in violation of 18 U.S.C. § 1512(b).

**COUNT FORTY-NINE (Misuse of Computer)**
18 U.S.C. §§ 1030(a)(2)(C) and (c)(2)(B)(ii)

76. On or about September 9, 2004, in the District of Connecticut and elsewhere, the defendant, **PAUL GALIETTI**, a Connecticut State Police Trooper, in furtherance of a criminal act in violation of the constitution or laws of the United States and of a State, that is, Connecticut, intentionally accessed a state police computer to obtain vehicle registration information from the National Crime Information Center ("NCIC") database in a manner that exceeded authorized access and thereby obtained information from a protected computer via an interstate communication.

All in violation of 18 U.S.C. § 1030(a)(2)(C) and § 1030(c)(2)(B)(ii).

**COUNT FIFTY (Misuse of Computer)**
18 U.S.C. §§ 1030(a)(2)(C) and (c)(2)(B)(ii)

77. On or about January 10, 2005, in the District of Connecticut and elsewhere, the

defendant, **PAUL GALIETTI**, a Connecticut State Police Trooper, in furtherance of a criminal act in violation of the constitution or laws of the United States or of any State, that is Connecticut, intentionally accessed a state police computer to obtain vehicle registration information from the National Crime Information Center ("NCIC") database in a manner that exceeded authorized access and thereby obtained information from a protected computer via an interstate communication.

All in violation of 18 U.S.C. § 1030(a)(2)(C) and § 1030(c)(2)(B)(ii).

**COUNT FIFTY-ONE (Interference with Search Warrant)**
18 U.S.C. § 2232(a)

78. On or about July 20, 2005, in the District of Connecticut, the defendant, **JASON MANAFORT**, before a search and seizure of property, to wit, a computer, by a person authorized to make said search and seizure, did knowingly dispose of and take action and did attempt to dispose of and take such action for the purpose of preventing or impairing the federal government's lawful authority to take such property into its custody or control.

All in violation of 18 U.S.C. § 2232(a).

**COUNT FIFTY-TWO (False Statement)**
18 U.S.C. § 1001

79. On or about July 20, 2005, in the District of Connecticut, the defendant, **JASON MANAFORT**, in a matter within the jurisdiction of the executive branch of the United States did knowingly and willfully make a material false, fictitious, and fraudulent statement or representation in that he stated that he did not know the whereabouts of a computer located at his desk and that he did not know whether there had been a computer there, when in truth and fact, he knew that there had been a computer at that location.

All in violation of 18 U.S.C. § 1001.

**COUNT FIFTY-THREE (Interference with Electronic Surveillance)**
18 U.S.C. § 2232(d)

80. On or about July 19, 2005, in the District of Connecticut, the defendant, **RICHARD GALIETTI**, having knowledge that a Federal investigative officer had been authorized to intercept a wire communication, in order to obstruct, impede, and prevent such interception, did give notice and attempt to give notice of such interception to Ciro Viento. who is not names as a defendant in this count.

All in violation of 18 U.S.C. § 2232(c).

**COUNT FIFTY-FOUR (False Statement)**
18 U.S.C. § 1001

81. On or about May 17, 2006, in the District of Connecticut, the defendant, **JOSEPH LOSTOCCO**, also known as "Fat Joe" Lostocco, an owner and operator of Lostocco Services, in a matter within the jurisdiction of the executive branch of the United States, did knowingly and willfully make a material false, fictitious, and fraudulent statement or representation in that he stated that he never warned a representative of **AWD**, including Ciro Viento, that a current **AWD** customer had contacted either himself or Lostocco Services about providing garbage removal services.

All in violation of 18 U.S.C. § 1001.

**COUNT FIFTY-FIVE (Extortion by Philip Armetta)**
18 U.S.C. § 1951

82. From in or about December 2003 to July 2004, in the District of Connecticut, the defendant **PHILIP ARMETTA,** together with others known and unknown, unlawfully and

knowingly attempted to and did commit extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), by taking and obtaining property, to wit: money, contractual rights and business opportunities, including but not limited to the right to solicit contracts and the fees paid by customers desiring services relating to the collection and hauling away of garbage, from and with the consent of the owners, officers, employees and agents of Company D, which consent was induced by the wrongful use of actual and threatened force, violence, and fear, including but not limited to fear of physical and economic harm, and thereby obstructed, delayed, and affected commerce, and the movement of articles and commodities in commerce.

All in violation of 18 U.S.C. §§ 1951 and 2.

**COUNT FIFTY-SIX (Wire Fraud Conspiracy and Attempt)**
18 U.S.C. § 1349

**General Allegations**

**I. The United Hockey League**

83. At all times relevant to this indictment, the United Hockey League, Inc., hereinafter the "UHL," was a minor league professional hockey league operating in the United States. In 2004, the league was composed of fourteen teams, called member clubs, located in Connecticut, New York, Virginia, Michigan, Illinois, Indiana, and Missouri. The teams were organized into three divisions, the Eastern Division, Central Division, and Western Division, and played approximately 76 league games in the 2004-2005 season.

84. At all times relevant to this indictment, the headquarters of the UHL were located at 1831 Lake St. Louis Boulevard, Lake St. Louis, Missouri. During the 2004-2005 season, at least one employee of the UHL worked in the state of Iowa.

85. The UHL has implemented a set of Rules and Regulations and a set of By-Laws that have been adopted and approved by the UHL Board of Governors.

86. The UHL Rules and Regulations require Member Clubs to submit weekly statements reporting each team's compliance with the salary cap provision by transmitting information to the UHL. Teams that report salary expenditures in excess of the designated salary cap will be assessed a monetary fine by the UHL in accordance with the provisions described below.

87. Specifically, Section 8 of the UHL Rules and Regulations outlines the Salary Cap provision. For the 2004-2005 regular season, the UHL required member clubs to not exceed approximately $275,000 in salaries for players on their active roster.

88. Section 8C of the UHL Rules and Regulations states that "[u]pon finding by the League Office that a Member Club has exceeded the yearly salary cap, said Member Club shall remit to the League Office two dollars for every dollar over said cap, payable upon demand by the League Office. All monies received by the League Office as a result of the violation of the salary cap shall be distributed equally among all Member Clubs not in violation of said salary cap for the season in which the tax is imposed."

89. Section 8D of the UHL Rules and Regulations states, in part, that "[a]ll member clubs are responsible for submitting weekly salary cap reports to the League Office on [the] Wednesday of each week by 5:00 p.m. E.S.T. for the week prior."

90. Section 8G of the UHL Rules and Regulations states that "[a]ll member clubs are responsible for reporting accurate information on salary cap reports submitted to the League office. The information included on said reports shall accurately represent all remuneration in cash or goods and services earned by Players from the Member Club or any agent or extension of

the Member Club for the period listed on the report. Any false information listed on a report shall represent a breach of UHL By-Laws and could result in a fine up to $25,000 (1st offense) or revocation of Member Club (2nd offense) and possible forfeiture of games."

91. The reports are signed by both the Member Club's Governor and General Manager/Coach, or their designees. At the bottom of each weekly report, each signatory executes a statement indicting that the report "accurately represents all renumeration [sic] in cash or good and services earned by the players from the Club or any agent or extension of the Club for the period listed above. Any false information herein shall represent a breach of the United Hockey League By-Laws and could result in a fine up to $25,000 (first offense) or revocation of Member Club (2nd offense) and possible forfeiture of games. This report is to be faxed to the League Office by 5:00 p.m. on the Wednesday following the reporting period. I have reviewed the information and to the best of my knowledge all representations are accurate."

92. Further, the Member Clubs are also required to file a Housing/Living Allowance report on a monthly basis. These reports require the Member Clubs to disclose to the UHL the amount of the Housing/Living Allowance that is either paid to the hockey player or directly to the player's landlord. The Housing/Living Allowance Reports contain a statement similar to that contained in the Salary Cap Report, which is described above. Also like the Salary Cap Report, the monthly Housing/Living Allowance Report is signed by the Member Club's Governor and the Teams General Manager/Coach, or their designees.

## II. The Danbury Trashers

93. At all times relevant to this indictment, the **TRASHERS, LLC** (hereafter "the **DANBURY TRASHERS**") were a Member Club in the UHL. The **DANBURY TRASHERS**,

who played their home games in Danbury, Connecticut, are affiliated with by **AWD**, which in turn is owned in part by **JAMES GALANTE**, a defendant herein.

94. The **DANBURY TRASHERS'** business address is listed as 60 Newtown Road, Suite 43, Danbury, Connecticut, specifically, Mail Box Number 43 located in the "Route 6 MailRoom." The Route 6 MailRoom is a commercial mail drop facility located in a retail facility. Representatives and employees of the **DANBURY TRASHERS**, however, maintain office space at 307 White Street, Danbury, Connecticut.

95. **AWD** is a carting company owned in part by **JAMES GALANTE**, a defendant herein. The **DANBURY TRASHERS** are affiliated with **AWD**.

96. As noted above, **JAMES GALANTE** is also the owner or co-owner of several other carting companies, including, but not limited to, **DWD**, **Danbury Carting**, and **ARC**. **Danbury Carting** is affiliated with **SWD**, another carting company owned in part by **JAMES GALANTE**.

97. During the 2004-2005 UHL hockey season, **J. TODD STIRLING**, a defendant herein, was the coach of the **DANBURY TRASHERS**.

98. At all times relevant to this indictment, **RONALD ZOLLO**, a defendant herein, was controller for **AWD**, a company affiliated with the **DANBURY TRASHERS**.

**III. The Scheme and Artifice to Defraud the UHL**

99. From in or about May 2004, to April 2005, in the District of Connecticut and elsewhere, the defendants **JAMES GALANTE, J. TODD STIRLING, RONALD ZOLLO**, the **DANBURY TRASHERS** and others known and unknown to the Grand Jury did knowingly intend to devise and did devise a scheme and artifice to defraud the UHL by making material

false representations.

100. In general, this scheme involved circumventing the salary cap provision contained in the UHL Rules and Regulations by placing certain hockey players and/or the spouses of hockey players on the payroll of various trash hauling companies owned by defendant **JAMES GALANTE**. These players and/or their spouses would receive payments from a trash hauling company, when in fact they provided no services to that company. The hockey players would also receive a regular salary from the **DANBURY TRASHERS**. The checks from the trash hauling company and the **DANBURY TRASHERS** would often be personally delivered to the players by **RONALD ZOLLO**. Typically, these checks were signed either by **JAMES GALANTE** or **RONALD ZOLLO**.

### IV. The Manner and Means By Which The Conspiracy Was Carried Out

101. As part of this scheme, **JAMES GALANTE** caused representatives of the **DANBURY TRASHERS** to regularly transmit via interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication from Connecticut to a UHL representative who was located outside of Connecticut. These reports were transmitted via interstate wires on a weekly basis. Thus, for the period of October 20, 2004, through and including May 17, 2005, **JAMES GALANTE** and **J. TODD STIRLING** caused the **DANBURY TRASHERS** to fax approximately thirty (30) Salary Cap Reports to the UHL, each of which contained a material misrepresentation. These reports were signed, *inter alia*, by **J. TODD STIRLING**.

102. Further, it was also part of the scheme that **JAMES GALANTE** caused certain carting companies he owned to provide certain hockey players with additional checks purportedly for a

housing allowance, when in fact the **DANBURY TRASHERS** had already paid the housing allowance permitted by the UHL directly to the hockey players' landlords. These payments were provided to the players on many occasions by **RONALD ZOLLO**. Such payments by the carting companies in fact constituted additional salary paid to certain hockey players that was not reported on the weekly UHL Salary Cap Report.

103. It was also part of the scheme that **JAMES GALANTE** and **J. TODD STIRLING** caused the **DANBURY TRASHERS** to transmit via interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication from Connecticut to another state. These telefax communications, which were transmitted on a weekly basis, stated that the **DANBURY TRASHERS** had paid the permitted UHL housing allowance directly to the hockey player's landlord and omitted any reference to housing allowances paid directly paid to the players.

104. By the end of the 2004-2005 season, the sum of the salaries and extra payments made under the guise of a "housing allowance" to the players and/or their spouses by the **DANBURY TRASHERS** and the various carting companies exceeded the salary cap established by the UHL. The defendants, however, only reported the portion of the players' total salary attributable to the **DANBURY TRASHERS** for the purpose of complying with the UHL's salary cap.

105. This scheme to defraud the UHL benefitted the defendants in at least two ways. First, by under-reporting the salaries to the UHL, the defendants avoided the assessment of a monetary fine by the UHL or the imposition of another penalty such as the loss of games. Second, by creating a fraudulent scheme to avoid the salary cap, the **DANBURY TRASHERS** could seek a higher percentage of skilled players that would allow them to better compete during the 2004

season. In fact, in the 2004-2005 season, this scheme allowed the **JAMES GALANTE** to pay three key players on the **DANBURY TRASHERS** a salary of approximately of $100,000 each, when the UHL salary cap was only approximately $275,000 for the entire team for the regular season. For the 2004-2005 season, **JAMES GALANTE** paid approximately $750,000 in total compensation to hockey players. In their inaugural season as a Member Club, the **DANBURY TRASHERS** finished second in their division and participated in the UHL playoffs.

## V. Overt Acts

106. In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed in the District of Connecticut and elsewhere:

### A. Fraudulent Representations Made by the Danbury Trashers to the UHL Re: Hockey Player A

107. On or about June 29, 2004, **JAMES GALANTE**, a defendant herein, caused Hockey Player A to be added to the payroll of **DWD** as a salesman. Hockey Player A performed no services as a salesman for **DWD**.

108. During the 2004-2005 UHL hockey season, **JAMES GALANTE** and **RONALD ZOLLO** caused **DWD** to issue periodic payments to Hockey Player A to supplement the pay Hockey Player A received pursuant to his contract with the **DANBURY TRASHERS**. The payments made to Hockey Player A from **DWD** and were not reported to the UHL in the weekly Salary Cap Reports.

109. For example, on or about November 26, 2004, the **DANBURY TRASHERS** issued People's Bank payroll check number 500001100 made payable to Hockey Player A in the amount of $603.39. On that same day, **DWD** issued People's Bank payroll check number 00215382 made payable to Hockey Player A in the amount of $1206.31. **JAMES GALANTE**

signed both of these checks.

110. On or about December 1, 2004, **JAMES GALANTE** and **J. TODD STIRLING**, for the purpose of executing the scheme and artifice, caused the **DANBURY TRASHERS** to transmit in interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication, namely a "United Hockey League Salary Cap Report" for the week ending on November 28, 2004 from Connecticut to a UHL representative in another state. This report indicated that Hockey Player A received only $750.00 in total salary, which was a material misrepresentation to the UHL. This report was signed, inter alia, by **J. TODD STIRLING.**

**B. Fraudulent Representations Made by the Danbury Trashers to the UHL Re: Hockey Player B**

**1. Fraudulent Representations Made During the Week Ending December 5, 2004**

111. On or about November 15, 2004, **JAMES GALANTE**, a defendant herein, caused the spouse of Hockey Player B to be added to the payroll of Danbury Carting as a salesperson. The spouse of Hockey Player B performed no services as a salesperson for Danbury Carting.

112. During the 2004-2005 UHL hockey season, **JAMES GALANTE** and **RONALD ZOLLO** caused Danbury Carting to issue periodic payments to the spouse of Hockey Player B to supplement the pay Hockey Player B received pursuant to his contract with the Danbury Trashers. The payments made to the spouse of Hockey Player B from Danbury Carting were not reported to the UHL in the weekly "Salary Cap Report."

113. For example, on or about December 3, 2004, the **DANBURY TRASHERS** issued People's Bank payroll check number 50000155 made payable to Hockey Player B for $605.86. On that same day, Danbury Carting issued People's Bank payroll check number 7419 made

payable to the spouse of Hockey Player B in the amount of $888.91. **JAMES GALANTE** signed both of these checks.

114. On or about December 7, 2004, **JAMES GALANTE** and **J. TODD STIRLING**, for the purpose of executing the scheme and artifice, caused the **DANBURY TRASHERS** to transmit in interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication, namely a "United Hockey League Salary Cap Report" for the week ending on December 5, 2004 from Connecticut to a UHL representative in another state. This report indicated that Hockey Player B received only $700.00 in total salary, which was a material misrepresentation to the UHL. This report was signed, *inter alia*, by **J. TODD STIRLING**.

**2. Fraudulent Representations Made During the Week Ending December 19, 2004**

115. In or about December, 2004, **JAMES GALANTE**, a defendant herein, caused the spouse of Hockey Player B to be removed from the payroll of Danbury Carting and instead caused Hockey Player B to be added to the payroll of Danbury Carting as a salesperson. Like his spouse, Hockey Player B performed no services as a salesperson for Danbury Carting.

116. During the 2004-2005 UHL hockey season, **JAMES GALANTE** and **RONALD ZOLLO** caused Danbury Carting to issue periodic payments to Hockey Player B to supplement the pay Hockey Player B received pursuant to his contract with the **DANBURY TRASHERS**. The payments made to Hockey Player B from Danbury Carting were not reported to the UHL in the weekly "Salary Cap Report."

117. For example, on or about December 17, 2004, the **DANBURY TRASHERS** issued

People's Bank payroll check number 50000208 made payable to Hockey Player B in the amount of $605.86. On that same day, Danbury Carting issued People's Bank payroll check number 7446 made payable to Hockey Player B in the amount of $888.91. **JAMES GALANTE** signed both of these checks.

118. On or about December 21, 2004, **JAMES GALANTE** and **J. TODD STIRLING**, for the purpose of executing the scheme and artifice, caused the **DANBURY TRASHERS** to transmit in interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication, namely a "United Hockey League Salary Cap Report" for the week ending on December 19, 2004 from Connecticut to a UHL representative in another state. This report indicated that Hockey Player B received only $700.00 in total salary, which was a material misrepresentation to the UHL. This report was signed, *inter alia*, by **J. TODD STIRLING.**

**3. Fraudulent Housing Allowance Payments Made to Hockey Player B in December 2004**

119. Further, it was part of the scheme and artifice that during December 2004, Hockey Player B directly received several payments under the guise of a "housing allowance." In fact, for the month of December 2004, the **DANBURY TRASHERS** directly paid the landlord of Hockey Player B for housing costs. Danbury Carting, however, made additional 'housing allowance payments' directly to Hockey Player B. The direct housing allowance payments made to Hockey Player B constituted income that was not reported on any salary cap report submitted by the **DANBURY TRASHERS** to the UHL in December 2004.

120. For example, on December 2, 2004, Danbury Carting issued Peoples Bank check 2288 made payable to Hockey Player B in the amount of $600. The reference line on this check

contained the notation "Housing Allowance." The check was signed by **RONALD ZOLLO**.

121. Further, on December 9, 2004, Danbury Carting issued Peoples Bank check 2343 made payable to Hockey Player B in the amount of $600. The reference line on this check contained the notation "Housing Allowance." The check was signed by **RONALD ZOLLO**.

122. Further, on December 16, 2004, Danbury Carting issued Peoples Bank check 2390 made payable to Hockey Player B in the amount of $600. The reference line on this check contained the notation "Housing Allowance." The check was signed by **RONALD ZOLLO**.

123. Further, on December 22, 2004, Danbury Carting issued Peoples Bank check 2421 made payable to Hockey Player B in the amount of $600. The reference line on this check contained the notation "Housing Allowance." The check was signed by **RONALD ZOLLO**.

124. Further, on December 30, 2004, Danbury Carting issued Peoples Bank check 2465 made payable to Hockey Player B in the amount of $600. The reference line on this check contained the notation "Housing Allowance." The check was signed by **RONALD ZOLLO**.

125. Thus, during December 2004, Danbury Carting paid $3000 to Hockey Player B under the guise of housing allowances, when in fact the actual housing allowance was paid directly to the Hockey Player B's landlord. These housing allowance payments, like the salary payments provided to Hockey Player B and his wife from Danbury Carting during the same time period, were not reported on the salary cap reports faxed to the UHL in December 2004.

### C. Fraudulent Representations Made by the Danbury Trashers to the UHL Re: Hockey Player C

126. On or about May 10, 2004, **JAMES GALANTE**, a defendant herein, caused Hockey Player C to be added to the payroll of **ARC** as a salesman. Hockey Player C performed no services for **ARC**.

127. During the 2004-2005 UHL hockey season, **JAMES GALANTE** and **RONALD ZOLLO** caused **ARC** to issue periodic payments to Hockey Player C to supplement the pay Hockey Player C received pursuant to his contract with the **DANBURY TRASHERS**. The payments made to Hockey Player C from **ARC** were not reported to the UHL in the weekly Salary Cap Report.

128. For example, on or about December 17, 2004, the **DANBURY TRASHERS** issued People's Bank payroll check number 50000187 to Hockey Player C in the amount of $612.34. On that same day, **ARC** issued People's Bank payroll check 19023 check to Hockey Player C in the amount of $1408.35. **JAMES GALANTE** signed both of these checks.

129. On or about December 21, 2004, for the purpose of executing the scheme and artifice, **JAMES GALANTE** and **J. TODD STIRLING** caused the **DANBURY TRASHERS** to transmit in interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication, namely a "United Hockey League Salary Cap Report" for the week ending on November 19, 2004 from Connecticut to a UHL representative in another state. This report indicated that Hockey Player C received only $725.00 in total salary, which was a material misrepresentation to the UHL.

**D. Fraudulent Representations Made by the Danbury Trashers to the UHL Re: Hockey Player D**

130. On or about March 21, 2005, **JAMES GALANTE**, a defendant herein, caused the spouse of Hockey Player D to be added to the payroll of Danbury Carting as a sales person. The spouse of Hockey Player D performed no services for Danbury Carting.

131. During the 2004-2005 UHL hockey season, **JAMES GALANTE** and **RONALD ZOLLO** caused Danbury Carting to issue periodic payments to the spouse of Hockey Player D to

supplement the pay Hockey Player D received pursuant to his contract with the Danbury Trashers. These payments made to the spouse of Hockey Player D from Danbury Carting were not reported to the UHL in the weekly Salary Cap Report.

132. For example, on or about April 1, 2005, the **DANBURY TRASHERS** issued Savings Bank of Danbury payroll check number 50000656 made payable to Hockey Player D in the amount of $502.46. On that same date, Savings Bank of Danbury issued payroll check number 7586 made payable to the spouse of Hockey Player D in the amount of $1063.84. **JAMES GALANTE** signed both of these checks.

133. On or about April 4, 2005, **JAMES GALANTE** and **J. TODD STIRLING**, for the purpose of executing the scheme and artifice, caused the **DANBURY TRASHERS** to transmit in interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication, namely a "United Hockey League Salary Cap Report" for the week ending on April 3, 2005, from Connecticut to a UHL representative in another state. This report indicated that Hockey Player D received only $650.00 in total salary, which was a material misrepresentation to the UHL. This report was signed, inter alia, by **J. TODD STIRLING**.

**E. Fraudulent Representations Made by the Danbury Trashers to the UHL Re: Hockey Player E**

134. On or about August 16, 2004, **JAMES GALANTE**, a defendant herein, caused the spouse of Hockey Player E to be added to the payroll of **AWD** as an assistant sales manager with an annual salary of $74,000. The spouse of Hockey Player E performed no services as an assistant sales manager for **AWD**.

135. During the 2004-2005 UHL hockey season, **JAMES GALANTE** and **RONALD ZOLLO** caused **AWD** to issue periodic payments to the spouse of Hockey Player E to

supplement the pay Hockey Player E received pursuant to his contract with the Danbury Trashers. These payments made to the spouse of Hockey Player E from **AWD** were not reported to the UHL in the weekly "Salary Cap Report."

136. For example, on or about December 10, 2004, the **DANBURY TRASHERS** issued People's Bank payroll check number 50000163 to Hockey Player E in the amount of $549.09. On that same day, **AWD** issued People's Bank payroll check number 54920 made payable to the spouse of Hockey Player E in the amount of $1027.15. The check was signed by **RONALD ZOLLO**.

137. On or about December 15, 2004, **JAMES GALANTE** and **J. TODD STIRLING**, for the purpose of executing the scheme and artifice, caused the **DANBURY TRASHERS** to transmit in interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication, namely a "United Hockey League Salary Cap Report" for the week ending on December 12, 2004 from Connecticut to a UHL representative in another. This report indicated that Hockey Player E received only $700.00 in total salary, which was a material misrepresentation to the UHL. This report was signed, *inter alia*, by **J. TODD STIRLING**.

138. In response to the fraudulent salary cap reports described above that defendant **JAMES GALANTE** caused to be submitted to the UHL, during the 2004-2005 season the UHL never assessed either a monetary fine or other penalty against the **DANBURY TRASHERS** for violating the league salary cap provision, when, in fact, by the end of the 2004-2005 regular season the **DANBURY TRASHERS** were in violation of the UHL's Regulations.

139. Further, under to Section 8G of the UHL Rules and Regulations, each of the fraudulent salary cap reports submitted to the UHL exposed the **DANBURY TRASHERS** to a fine of up to

$25,000 as well as other penalties. During the 2004-2005 season, the UHL neither fined nor penalized the **DANBURY TRASHERS** for the submission of false and Salary Cap Reports.

All in violation of 18 U.S.C. § 1349.

**COUNT FIFTY-SEVEN (Wire Fraud/Aiding & Abetting)**
18 U.S.C. §§ 1343 & 2

140. The allegations contained in paragraphs 83-139 of Count Fifty-Six are re-alleged and incorporated as if fully set forth herein.

141. On or about December 1, 2004, the defendants **JAMES GALANTE** and **J. TODD STIRLING**, for the purpose of executing the scheme and artifice described above, caused the **DANBURY TRASHERS** to transmit in interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication from Connecticut to a UHL representative in another state that contained a material misrepresentation to the UHL.

All in violation of 18 U.S.C. §§ 1343 and 2.

**COUNT FIFTY-EIGHT (Wire Fraud/Aiding & Abetting)**
18 U.S.C. §§ 1343 & 2

142. The allegations contained in paragraphs 83-139 of Count Fifty-Six are re-alleged and incorporated as if fully set forth herein.

143. On or about December 7, 2004, the defendants **JAMES GALANTE** and **J. TODD STIRLING**, for the purpose of executing the scheme and artifice described above, caused the **DANBURY TRASHERS** to transmit in interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication from Connecticut to a UHL representative in another state that contained a material misrepresentation to the UHL.

All in violation of 18 U.S.C. §§ 1343 and 2.

**COUNT FIFTY-NINE (Wire Fraud/Aiding & Abetting)**
18 U.S.C. §§ 1343 & 2

144. The allegations contained in paragraphs 83-139 of Count Fifty-Six are re-alleged and incorporated as if fully set forth herein.

145. On or about December 15, 2004, the defendants **JAMES GALANTE** and **J. TODD STIRLING**, for the purpose of executing the scheme and artifice described above, caused the **DANBURY TRASHERS** to transmit in interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication from Connecticut to a UHL representative in another  that contained a material misrepresentation to the UHL.

All in violation of 18 U.S.C. §§ 1343 and 2.

**COUNT SIXTY(Wire Fraud/Aiding & Abetting)**
18 U.S.C. §§ 1343 & 2

146. The allegations contained in paragraphs 83-139 of Count Fifty-Six are re-alleged and incorporated as if fully set forth herein.

147. On or about December 21, 2004, the defendants **JAMES GALANTE** and **J. TODD STIRLING**, for the purpose of executing the scheme and artifice described above, caused the **DANBURY TRASHERS** to transmit in interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication from Connecticut to a UHL representative in another state that contained a material misrepresentation to the UHL.

All in violation of 18 U.S.C. §§ 1343 and 2.

**COUNT SIXTY-ONE (Wire Fraud/Aiding & Abetting)**
18 U.S.C. §§ 1343 & 2

148. The allegations contained in paragraphs 83-139 of Count Fifty-Six are re-alleged and

incorporated as if fully set forth herein.

149. On or about April 4, 2005, the defendants **JAMES GALANTE** and **J. TODD STIRLING** for the purpose of executing the scheme and artifice described above, caused the **DANBURY TRASHERS** to transmit in interstate commerce, by means of a wire communication, certain signs and signals, that is a telefax communication from Connecticut to a UHL representative in another state that contained a material misrepresentation to the UHL.

All in violation of 18 U.S.C. §§ 1343 and 2.

**COUNT SIXTY-TWO (Conspiracy to Defraud the IRS)**
18 U.S.C. § 371

150. The allegations contained in paragraphs 1 to 149 of the Indictment are re-alleged and incorporated as if fully set forth herein.

**The Objects of the Conspiracy to Defraud the Internal Revenue Service**

151. That from on or about September 2, 2000 to on or about April 15, 2005, in the District of Connecticut and elsewhere, the defendants, **JAMES GALANTE, CHRISTOPHER RAYNER, RONALD ZOLLO, ERIC ROMANDI, LISA HENRY, ANNA PRISKIE, CARMINE DOMINICUS**, **MATTHEW IANNIELLO, AUTOMATED WASTE DISPOSAL, DIVERSIFIED WASTE DISPOSAL, SUPERIOR WASTE DISPOSAL, JAT TRUCK REPAIR, INC., 530 MAIN STREET NORTH CORP, DANBURY CARTING COMPANY, INC**., **TRANSFER SYSTEMS, INC., ADVANCED RECYCLING CORPORATION,** and **THOMAS REFUSE** and others known and unknown to the Grand Jury, did unlawfully, willfully and knowingly conspire, combine, confederate and agree together and with each other to defraud the United States for the purpose of impeding, impairing, obstructing

and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment and collection of the revenue, that is, income taxes.

152. The objects of the conspiracy included permitting defendant **JAMES GALANTE** to reduce his federal tax liability by a variety of methods including, but not limited to, overstating and falsifying business expenses for **AWD** , **JAT** and **TSI**.

153. It was also an object of the conspiracy to permit defendants **AWD** and **JAT** reduce their federal tax liability by taking improper deductions for payments made to certain individuals by characterizing those payments as wages, including, but not limited to payments to (a) **ANNA PRISKIE**, **CARMINE DOMINICUS**, individuals related to **THOMAS MILO**; (b) **LISA HENRY**; (c) certain hockey players who played for the **DANBURY TRASHERS**; (d) certain members of a racing team owned by defendant **JAMES GALANTE;** and (e) and Hockey Coach A, who coached the high school hockey team of the son of defendant **JAMES GALANTE.**

154. It was also an object of the conspiracy to allow defendant **JAMES GALANTE** to reduce his federal tax liability by failing to report income he received from both **ERIC ROMANDI** and another employee of one of **JAMES GALANTE's** companies, hereinafter referred to as Employee A. As part of this scheme, **JAMES GALANTE** caused **ERIC ROMANDI** to receive three paychecks and caused Employee A to receive two paychecks. It was part of the scheme that **JAMES GALANTE** directed **ERIC ROMANDI** and Employee A to provide him with weekly cash payments that represented a portion of the proceeds of these checks. As part of the scheme, both **ERIC ROMANDI** and Employee A would periodically cash one or more of these multiple paychecks and cause some or all of the cash to be delivered to

**JAMES GALANTE**. **JAMES GALANTE** did not report such income to the Internal Revenue Service.

155. It was also part of the conspiracy that defendant **JAMES GALANTE** and **CHRISTOPHER RAYNER** caused the formation of **530 MAIN STREET NORTH,** a business entity whose name was later changed to Nutmeg Investments, for no legitimate business purpose. **JAMES GALANTE** and **CHRISTOPHER RAYNER** created the company solely to hold the real property located at 530 Main Street in Southbury, Connecticut, which is the residence of **LISA HENRY**. Further, **JAMES GALANTE** and **CHRISTOPHER RAYNER** caused **530 MAIN STREET,** d.b.a. Nutmeg Investments to deduct expenses associated with the real property located at 530 Main Street in Southbury, Connecticut as corporate business expenses.

156. It was also an object of the conspiracy that defendant **JAMES GALANTE** avoided the payment of federal income tax by diverting or skimming a portion of the cash proceeds generated by businesses he controlled, including but not limited to **TSI**, **AWD, DWD,** and **SWD** or their affiliated companies**.** It was also an object of the conspiracy that neither **JAMES GALANTE** nor these companies reported such income to the Internal Revenue Service.

157. It was also an object of the conspiracy that, from in about 2000 through and including 2005, defendant **JAMES GALANTE** provided approximately $30,000 in United States currency on a quarterly basis to **MATTHEW IANNIELLO**, and that such taxable income was not reported by **MATTHEW IANNIELLO** to the Internal Revenue Service.

158. It was also an object of the conspiracy (1) to permit defendants **ANNA PRISKIE**, **CARMINE DOMINICUS**, **LISA HENRY** and another individual not named in this indictment,

to receive money and benefits from **JAMES GALANTE** and **AWD** under the guise of W-2 wage income when in fact the defendants did not work for **AWD**; (2) to allow defendants **ANNA PRISKIE**, **CARMINE DOMINICUS**, **LISA HENRY** and another individual to claim such income as W-2 earned income rather than some other form of taxable income on false personal tax returns filed with the Internal Revenue Service; and (3) to allow **AWD** to falsely report the payments to **ANNA PRISKIE**, **CARMINE DOMINICUS**, and **LISA HENRY** and another individual as wages on **AWD's** corporate income tax returns and the Form 941 quarterly employment tax returns filed on behalf of **AWD**. Such actions were designed to conceal from the Internal Revenue Service that **ANNA PRISKIE**, **CARMINE DOMINICUS**, **LISA HENRY** and another individual in fact did not work as W-2 wage earners for **AWD** by, among other things, the filing of both false corporate and personal income tax returns with the Internal Revenue Service.

**The Manner and Means by Which the Conspiracy was Carried Out**

**1. False Expenses**

159. It was part of the conspiracy that, beginning in at least January, 2000 and continuing through July, 2005 that **JAMES GALANTE** and **CHRISTOPHER RAYNER** caused the creation of false, fraudulent and fictitious expense reports that resulted in cash payments to **JAMES GALANTE** by **AWD**. These false reports included fictitious expenditures for, among other things, personal expenditures made by **JAMES GALANTE**, fuel, maps, tolls, soil, truck washes, firewood, gravel, oil, log books, roof shingles, tolls, kerosene, film batteries, gate locks, mulch, cleaning supplies, and wood pallets. Cash for these 'expenses,' which where in fact not incurred by **AWD**, was provided to **JAMES GALANTE** under the guise of a reimbursement.

**JAMES GALANTE** did not report such income to the Internal Revenue Service. Further, it was also part of the conspiracy that **AWD** deducted these expenses on federal corporate tax returns filed for 2000, 2001, 2002, and 2003 tax years.

160. It was also part of the conspiracy that **JAMES GALANTE** and **CHRISTOPHER RAYNER** caused the creation of false, fraudulent and fictitious reports to be created for expenses paid to **JAMES GALANTE** by **TSI**. These false reports were comprised of fictitious payments allegedly made to day laborers, when in fact no such payments were made. The money that was reportedly paid to the day laborers was in fact provided to **JAMES GALANTE** on a weekly basis and **JAMES GALANTE** did not report such income to the Internal Revenue Service. Further, it was also part of the conspiracy that **TSI** deducted these expenses on federal corporate tax returns filed in 2000, 2001, 2002, and 2003.

161. It was also part of the conspiracy that **JAMES GALANTE** caused expenses incurred by his racing team to be improperly deducted as business expenses for **JAT**. These false expenses include, but are not limited to, expenditures for equipment and materials related to racing cars. As noted below, **JAMES GALANTE** also maintained members of a racing team on the payroll of **JAT** and **AWD**, even though they provided no services to **JAT** or **AWD**. Further, in addition to a salary, **JAMES GALANTE** provided some of these racing team members with health benefits and workers compensation coverage.

162. It was also part of the conspiracy that starting in or about August, 2005, **JAMES GALANTE** and **ERIC ROMANDI** conspired to influence, obstruct, impede or endeavor to influence the grand jury testimony of Witness A. This conspiracy included, but is not limited to, **JAMES GALANTE's** attempt to directly influence the testimony of Witness A by discussing

the witness's testimony with the witness and by attempting to intimidate Witness A by other means. Further, **JAMES GALANTE** attempted to indirectly influence the testimony of Witness A by causing **ERIC ROMANDI** to meet with Witness A. At **JAMES GALANTE's** direction, **ERIC ROMANDI** instructed Witness A to provide false or misleading information to both federal investigators and the Grand Jury.

**2. Improper Deductions of Employee Salaries**

**a. Thomas Milo's Relatives**

163. It was also part of the conspiracy that, beginning in at least January 2000 and continuing through April 2005, the defendants **ANNA PRISKIE**, **CARMINE DOMINICUS** and another person not named in this indictment were placed and maintained on **AWD's** payroll, even though **ANNA PRISKIE, CARMINE DOMINICUS** and the other individual did not work for **AWD**. **ANNA PRISKIE**, **CARMINE DOMINICUS** and the other individual are related to THOMAS MILO.

164. It was further part of the conspiracy that, beginning in at least January, 2000 and continuing through January, 2005, defendant **ANNA PRISKIE** received purported wages totaling approximately $90,458.80; in the following amounts:

| | |
|---|---|
| 2000: | $18,009.00 |
| 2001: | $18,284.80 |
| 2002: | $17,940.00 |
| 2003: | $17,940.00 |
| 2004: | $18,285.00 |

165. It was further part of the conspiracy that, beginning in at least January 2000 and

continuing through January 2005, defendant **CARMINE DOMINICUS** received purported wages totaling approximately $90,459.00; in the following amounts:

| | |
|---|---|
| 2000: | $18,009.00 |
| 2001: | $18,285.00 |
| 2002: | $17,940.00 |
| 2003: | $17,940,00 |
| 2004: | $18,285.00 |

166. It was part of the conspiracy that, beginning in at least January 2000 and continuing through January 2005, another individual related to THOMAS MILO received purported wages totaling approximately $52,000; in the following amounts:

| | |
|---|---|
| 2000: | $10,000.00 |
| 2001: | $10,600.00 |
| 2002: | $10,400.00 |
| 2003: | $10,400.00 |
| 2004: | $10,600.00 |

167. It was also part of the conspiracy that for the years 2000 to 2003, inclusive, **AWD** filed corporate income tax returns that falsely deducted approximately a total of $185,747.80 as wages for checks issued to defendants **ANNA PRISKIE, CARMINE DOMINICUS** and another individual.

168. It was further part of the conspiracy that the defendants **ANNA PRISKIE**, **CARMINE DOMINICUS** and another individual were also the beneficiaries of a company health care plan, even though defendants did not work for **AWD**. **ANNA PRISKIE**, **CARMINE DOMINICUS**

and another individual failed to report the value of such benefits to the Internal Revenue Service.

169. It was further part of the conspiracy that paychecks were mailed from Connecticut on a weekly basis to **ANNA PRISKIE**.

170. Further, it was also part of the conspiracy that, on an annual basis, W-2 forms were prepared that reported the monies paid to **ANNA PRISKIE, CARMINE DOMINICUS** and another individual as wages. Those W-2 forms were mailed from Connecticut to **ANNA PRISKIE** in New York and to **CARMINE DOMINICUS** in Danbury, Connecticut**.**

171. The defendants **ANNA PRISKIE, CARMINE DOMINICUS** and another individual furthered the conspiracy and continued the offense by attaching the W-2 forms they received from to a personal income tax return, and by signing and causing to be filed personal income tax returns that, in the aggregate, falsely reported that the approximately $180,917.80 received from **AWD,** for the years 2000 through and including 2004, was W-2 earned income when, in fact, such monies received from **AWD** were not wages and represented another form of taxable income.

172. In the years 2000-2005, the defendant **CARMINE DOMINICUS** furthered the conspiracy by signing his federal tax returns in Danbury, Connecticut and mailing them to the Internal Revenue Service from Danbury, Connecticut. These returns were signed by **CHRISTOPHER RAYNER** as the preparer.

173. In the years 2000-2004, the defendant **ANNA PRISKIE** furthered the conspiracy furthered the conspiracy by signing her federal tax returns in Cortland Manor, New York and mailing them an Internal Revenue Center located in Brookham, New York or White Plains, New York. These returns were signed by **CHRISTOPHER RAYNER** as the preparer.

**b. James Galante's Relatives and Friends**

174. It was also part of the conspiracy that from on or about August 13, 1990 to July 19, 2005, **JAMES GALANTE** caused **LISA HENRY** to be placed on the payroll of **AWD**, when in fact **HENRY** did not provide any services to **AWD** during that time period.

175. It was further part of the conspiracy that, beginning in at least January, 2000 and continuing through January 2005, defendant **LISA HENRY** received purported wages from **AWD** totaling approximately $188,574.20; in the following amounts:

| | |
|---|---|
| 2000: | $38,251.82 |
| 2001: | $36,625.04 |
| 2002: | $37,228.54 |
| 2003: | $37,878.40 |
| 2004: | $38,590.40 |

176. In the year 2000 through and including April 15, 2004, **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **AWD** to file false federal tax returns that improperly deducted the monies paid to **HENRY** as a business expenses. While **AWD** has not yet filed a federal tax return for 2004, during that year **JAMES GALANTE, CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **AWD** to file false, fictitious and fraudulent Form 941 quarterly employment tax returns, which falsely reflect wages paid to **HENRY**.

177. Further, it was also part of the conspiracy that, on an annual basis, W-2 forms were prepared that reported the monies paid to **LISA HENRY** as wages.

178. The defendant **LISA HENRY** furthered the conspiracy and continued the offense by

attaching the W-2 forms she received to a personal income tax return, and by signing the form in Connecticut, and causing to be filed personal income tax returns that, in the aggregate, falsely reported that the approximately $188,574.20 received from **AWD** for the years 2000 through and including 2004 were W-2 wages, when in fact such monies received from **AWD** were not wages but represented another form of taxable income.

179. Further, it was also part of the conspiracy that starting in or about May, 1996, **JAMES GALANTE** caused his daughter to be placed on the payroll of **AWD**. At that time, his daughter was five years old. For the years 2000 to 2004, **JAMES GALANTE** caused **AWD** to pay his daughter an aggregate amount of approximately $49,650.00, when in fact she provided no services to the company. During this time period, **JAMES GALANTE** caused **AWD** to deduct monies paid to his daughter as an employee expense on **AWD**'s federal tax return. In furtherance of the conspiracy, **JAMES GALANTE** caused **AWD** to issue W-2 forms to both the Internal Revenue Service and his daughter. These W-2 Forms were subsequently attached to federal income tax returns that were filed in **JAMES GALANTE**'s daughter's name with the Internal Revenue Service.

**c. Hockey Players**

180. From January 2004, through and including December 2004, it was also part of the conspiracy that various garbage hauling company companies controlled by **JAMES GALANTE**, including but not limited to **DWD**, **SWD**, **DCC**, and **ARC**, paid monies to certain hockey players or their respective spouses on the **DANBURY TRASHERS**, when in fact these players and/or their spouses provided no services to the trash hauling company.

181. During 2004 and 2005, **JAMES GALANTE**, **CHRISTOPHER RAYNER** and

**RONALD ZOLLO** caused **DWD**, **SWD** (the parent company of **DCC**) and **ARC** to file false, fictitious and fraudulent Form 941 quarterly employment tax returns that reflect that the monies paid to the hockey players and/or their spouses were employee wages.

**d. Racing Team Members**

182. From in or about January 2001, through and including December 2004, it was also part of the conspiracy that **JAMES GALANTE** caused Racing Team Members A, B, C and D to be placed on the payroll of **JAT** as "Supervisor[s]," when in fact these individuals were employed to service a racing team based in Plainville, Connecticut sponsored by **JAMES GALANTE** and provided no services to **JAT**.

183. Further, in or about 1996, **JAMES GALANTE** caused Racing Team Member E to be placed on the payroll of **AWD** as maintenance employee, when in fact Racing Team Member E was employed to service a racing team sponsored by **JAMES GALANTE** and provided no services to **AWD.**

184. From 2001-2004, **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **AWD**, the parent company of **JAT**, to improperly deduct the monies paid to Racing Team Members A, B, C, D and E as business expenses. In 2004, **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **JAT** to file false, fictitious and fraudulent Form 941 quarterly employment tax returns that reflected the monies paid to Racing Team Members A, B, C and D, were employee wages.

**e. High School Hockey Coach**

185. From November 26, 2001, through and including 2003, it was also part of the conspiracy that **JAMES GALANTE** caused Hockey Coach A, to be placed on the payroll of

**AWD** as a salesman, when in fact Hockey Coach A provided no services to **AWD**.

186. During this period of time, Hockey Coach A was actually employed by a retail store in Connecticut. Hockey Coach A also served as the assistant hockey coach for a local high school hockey team whose player roster at that time included the son of defendant **JAMES GALANTE**.

187. In or about 2002 and 2003, **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **AWD** to file false federal tax returns for the 2001 and 2002 tax years that improperly deducted the monies paid to Hockey Coach A as a business expense.

### 3. Galante Receives Cash Kickbacks From Two Employees

188. It was also part of the conspiracy that from in or about 2001 through and including 2005, **JAMES GALANTE** provided both **ERIC ROMANDI** and Employee A with additional paychecks with the understanding that **ERIC ROMANDI** and Employee A would cash those paychecks and provide a portion of the cash to **JAMES GALANTE**.

189. It was also part of the scheme that on a weekly basis Employee A would receive paychecks from **THOMAS REFUSE** and another company controlled by **JAMES GALANTE**. Employee A would cash both paychecks and would place approximately $2885.00, which is close to the after-tax amount provided by the paycheck from **THOMAS REFUSE**, in an unmarked envelope. Employee A would provide the money to **ERIC ROMANDI**, who caused the money to be delivered to **JAMES GALANTE** for **GALANTE's** personal use. **JAMES GALANTE** did not report this income to the Internal Revenue Service.

190. It was also part of the scheme that **JAMES GALANTE** caused **ERIC ROMANDI** to receive multiple paychecks. Like Employee A, **ERIC ROMANDI** caused **JAMES GALANTE** to receive a portion of the cash derived from these paychecks. **JAMES GALANTE** did not

report this income to the Internal Revenue Service.

191. Further, it was part of the conspiracy that **JAMES GALANTE** caused **SWD**, a company affiliated with **THOMAS REFUSE**, to deduct the wages paid to Employee A as a business expense, when in fact such wages actually constituted cash payments to **JAMES GALANTE**.

192. Further, it was part of the conspiracy that **JAMES GALANTE** and others known and unknown to the Grand Jury attempted to obstruct justice by creating fake, fraudulent and fictitious loan documents purportedly executed in 2001 and 2003 that characterized the weekly cash payments made by Employee A to **JAMES GALANTE** as loans. In fact, these purported loan documents were created and executed in 2006 in an attempt by **JAMES GALANTE** and others to obstruct justice and impede an ongoing Grand Jury investigation.

**4. Lisa Henry's Residence**

193. It was also part of the conspiracy that from in or about August, 1996, **JAMES GALANTE** established **530 MAIN STREET** in order to provide **LISA HENRY** with a private residence and horse farm.

194. It was also part of the conspiracy that **530 MAIN STREET** d.b.a. NUTMEG INVESTMENTS was a business entity established to hold the real property occupied by **LISA HENRY** and had no legitimate business purpose.

195. It was also part of the conspiracy that **JAMES GALANTE** provided funds to **530 MAIN STREET** to pay the mortgage and interest payments for the property. Such payments were reported by **530 MAIN STREET** as rental income when these payments were, in fact, monies derived from **JAMES GALANTE** or his companies.

196. It was also part of the conspiracy that **530 MAIN STREET** listed **HENRY's** household expenses, including but not limited to payments for landscaping, pool service, insurance, repairs, window cleaning, tree service, laundry services, and utilities, as business expenses. Further, in or about 2002, **530 MAIN STREET** filed a tax return that listed a home entertainment system costing $24,745 as a business expense. Upon information and belief, this home entertainment system was installed in the house occupied by **HENRY** and is not a legitimate business expense of **530 MAIN STREET**.

**5. Galante and Romandi Skim Cash Proceeds**

197. It was also part of the conspiracy that from at least in or about 2000 through and including 2005, **JAMES GALANTE** caused a portion of the cash proceeds generated by companies he controlled, including but not limited to **TSI** and **AWD,** to be provided directly to him and not reported to the Internal Revenue Service.

198. It was also part of the conspiracy that **JAMES GALANTE** caused a portion of the cash proceeds generated from customers who dump refuse at the transfer station located at 307 White Street to be provided directly to him. Specifically, **JAMES GALANTE** caused **ERIC ROMANDI** to regularly retrieve the cash from the scale house located at 307 White Street. **ERIC ROMANDI** would then cause a portion of this cash to be delivered to **JAMES GALANTE**, who did not report this income to the Internal Revenue Service.

199. It was also part of the conspiracy that **JAMES GALANTE** caused a portion of the cash derived from customers requesting the disposal of bulk items to be delivered to him on a regular basis. **JAMES GALANTE** did not report this income to the Internal Revenue Service.

200. It was also part of the conspiracy that **GALANTE** caused a portion of the proceeds

derived from customers using roll off containers provided by companies controlled by **JAMES GALANTE** not to be reported on those companies' books. **JAMES GALANTE** did not report this income to the Internal Revenue Service.

**6. Payments to Matthew Ianniello**

201. It was also part of the conspiracy that from in or about 2001 through and including 2005, that **JAMES GALANTE** provided periodic cash payments in the amount of approximately $30,000 to **MATTHEW IANNIELLO**, a high ranking member of the Genovese crime family. In this scheme, **MATTHEW IANNIELLO** arranged for a third party to visit **JAMES GALANTE** in Connecticut on a quarterly basis. Upon arriving at **JAMES GALANTE**'s business location in Danbury, Connecticut, the third party would receive an envelope containing approximately $30,000 in United States currency, and would thereafter cause this money to be delivered to **MATTHEW IANNIELLO.**

202. It was also part of the conspiracy that in or about 2001, **JAMES GALANTE** caused approximately $200,000 in United States currency to be delivered to **MATTHEW IANNIELLO.**

203. It was further part of the conspiracy that, for the tax years 2001 and 2002, **MATTHEW IANNIELLO** filed false, fraudulent and fictitious tax returns by failing to report this money to the Internal Revenue Service. It was further part of the conspiracy that for the tax years 2003, 2004 and 2005, **MATTHEW IANNIELLO** failed to file a United States tax return, even though he had received taxable income from **JAMES GALANTE** that necessitated such a filing.

**<u>Overt Acts</u>**

204. In furtherance of the conspiracy, and to effect the objects thereof, at least one of the

conspirators committed or caused be to committed one or more of the following overt acts in the District of Connecticut and elsewhere:

**1. Fraudulent Expenses**

205. On or before April 15, 2001, the defendant **JAMES GALANTE** did willfully make, subscribe and cause to be filed a false 2000 U.S. Individual Income Tax Return, Form 1040.

206. On or before October 15, 2002, the defendant **JAMES GALANTE** did willfully make, subscribe and cause to be filed a false 2001 U.S. Individual Income Tax Return, Form 1040.

207. On or before October 14, 2003, the defendant **JAMES GALANTE** did willfully make, subscribe and cause to be filed a false 2002 U.S. Individual Income Tax Return, Form 1040.

208. On or before July 8, 2004, the defendant **JAMES GALANTE** did willfully make, subscribe and cause to be filed a false 2003 U.S. Individual Income Tax Return, Form 1040.

209. On or before October 17, 2005, the defendant **JAMES GALANTE** did willfully make, subscribe and cause to be filed a false 2004 U.S. Individual Income Tax Return, Form 1040.

210. On or before October 24, 2002, the defendants **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **AWD** to willfully make, subscribe and cause to be filed a false 2000 U.S. Corporation Income Tax Return, Form 1120.

211. On or before June 17, 2005, the defendants **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **AWD** to willfully make, subscribe and cause to be filed a false 2001 U.S. Corporation Income Tax Return, Form 1120.

212. On or before September 21, 2003, the defendants **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **AWD** to willfully make, subscribe and cause to be filed a false 2002 U.S. Corporation Income Tax Return, Form 1120.

213. On or before September 19, 2004, the defendants **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **AWD** to willfully make, subscribe and cause to be filed a false 2003 U.S. Income Tax Return for an S Corporation, Form 1120S.

214. On or before September 19, 2001, the defendants **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **TSI** to willfully make, subscribe and cause to be filed a false 2000 U.S. Income Tax Return for an S Corporation, Form 1120S. Further, on or before May 12, 2005, **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **TSI** to willfully make, subscribe and cause to be filed a false 2000 amended U.S. Income Tax Return for an S Corporation, Form 1120S.

215. On or before September 20, 2002, the defendants **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **TSI** to willfully make, subscribe and cause to be filed a false 2001 U.S. Income Tax Return for an S Corporation, Form 1120S. Further, on or before May 12, 2005, **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **TSI** to willfully make, subscribe and cause to be filed a false 2001 amended U.S. Income Tax Return for an S Corporation, Form 1120S.

216. On or before September 18, 2003, the defendants **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **TSI** to willfully make, subscribe and cause to be filed a false 2002 U.S. Income Tax Return for an S Corporation, Form 1120S. Further, on or before December 8, 2003, **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **TSI** to willfully make, subscribe and cause to be filed a false 2002 amended U.S. Income Tax Return for an S Corporation, Form 1120S.

217. On or before September 19, 2004, the defendants **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **TSI** to willfully make, subscribe and cause to be filed a false 2003 U.S. Income Tax Return for an S Corporation, Form 1120S.

**2. No Show Employees**

**a. Carmine Dominicus**

218. By on or about January 22, 1992 through the present, defendant **CARMINE DOMINICUS** was placed and maintained on AWD's payroll, even though defendant **CARMINE DOMINICUS** did not work for **AWD**, an arrangement to which defendant **CARMINE DOMINICUS** agreed.

219. On or about November 30, 2002, the defendant **CARMINE DOMINICUS** signed enrollment form for health insurance stating that he was employed by Automated Waste Disposal, when in fact he did not provide any services to AWD as an employee.

220. From on or about January 1, 2000 to on or about April 15, 2005, defendant **CARMINE DOMINICUS** received monies under the guise of Form W-2 wages totaling approximately $90,459.00 and health insurance benefits from **AWD**, when in fact the defendant **CARMINE DOMINICUS** provided no services to **AWD** as an employee.

221. For example, on or about December 21, 2001, **JAMES GALANTE** signed payroll check Number 44253 drawn on an **AWD** account at People's Bank made payable to the defendant **CARMINE DOMINICUS** in the amount of $308.68, when in fact the defendant **CARMINE DOMINICUS** did not provide any services to AWD as an employee.

222. Further, on or about January 25, 2002, **JAMES GALANTE** signed payroll check Number 44606 drawn on an AWD account at People's Bank made payable to the defendant

**CARMINE DOMINICUS** in the amount of $311.94, when in fact the defendant **CARMINE DOMINICUS** did not provide any services to **AWD** as an employee.

223. On or before October 15, 2001, the defendant **CARMINE DOMINICUS** did willfully make and subscribe a false 2000 U.S. Individual Income Tax Return, Form 1040, that falsely reported that he had earned $18,009.00 in wages from **AWD**.

224. On or before April 15, 2002, the defendant **CARMINE DOMINICUS** did willfully make and subscribe a false 2001 U.S. Individual Income Tax Return, Form 1040, that falsely reported that he had earned $18,285.00 in wages from **AWD**.

225. On or before April 15, 2003, the defendant **CARMINE DOMINICUS** did willfully make and subscribe a false 2002 U.S. Individual Income Tax Return, Form 1040, that falsely reported that he had earned $17,940.00 in wages from **AWD**.

226. On or before April 15, 2004, the defendant **CARMINE DOMINICUS** did willfully make and subscribe a false 2003 U.S. Individual Income Tax Return, Form 1040, that falsely reported that he had earned $17,940.00 in wages from **AWD**.

227. On or before April 15, 2005, the defendant **CARMINE DOMINICUS** did willfully make and subscribe a false 2004 U.S. Individual Income Tax Return, Form 1040, that falsely reported that he had earned $18,285.00 in wages from **AWD**.

**b. Anna Priskie**

228. From on or about January 1, 2000, to on or about April 15, 2005, defendant **ANNA PRISKIE** received monies under the guise of Form W-2 wages totaling approximately $90,458.80 and health insurance benefits from **AWD**, when in fact the defendant **ANNA PRISKIE** provided no services to **AWD** as an employee.

229. By on or about May, 2000 through the present, defendant **ANNA PRISKIE** was placed and maintained on **AWD**'s payroll, even though defendant **ANNA PRISKIE** did not work for **AWD**, an arrangement to which defendant **ANNA PRISKIE** agreed.

230. On or about February, 2000, the defendant **ANNA PRISKIE** signed a enrollment form for health insurance stating that she was employed by Automated Waste Disposal as a clerical worker, when in fact she did not provide any services to **AWD** as an employee.

231. For example, on or about December 28, 2001, **JAMES GALANTE** signed payroll check Number 8598 drawn on an **AWD** account at People's Bank made payable to the defendant **ANNA PRISKIE** in the amount of $286.41, when in fact the defendant **ANNA PRISKIE** did not provide any services to **AWD** as an employee.

232. Further, on or about January 25, 2002, **JAMES GALANTE** signed payroll check Number 8649 drawn on an **AWD** account at People's Bank made payable to the defendant **ANNA PRISKIE** in the amount of $294.86 when in fact the defendant **ANNA PRISKIE** did not provide any services to **AWD** as an employee.

233. On or before April 15, 2001, the defendant **ANNA PRISKIE** did willfully make and subscribe a false 2000 U.S. Individual Income Tax Return, Form 1040, that falsely reported that she had earned $18,009.00 in wages from **AWD**.

234. On or before April 15, 2002, the defendant **ANNA PRISKIE** did willfully make and subscribe a false 2001 U.S. Individual Income Tax Return, Form 1040, that falsely reported that she had earned $18,284.80 in wages from **AWD**.

235. On or before April 15, 2003, the defendant **ANNA PRISKIE** did willfully make and subscribe a false 2002 U.S. Individual Income Tax Return, Form 1040, that falsely reported that

she had earned $17940.00 in wages from **AWD**.

236. On or before April 15, 2004, the defendant **ANNA PRISKIE** did willfully make and subscribe a false 2003 U.S. Individual Income Tax Return, Form 1040, that falsely reported that she had earned $17,940.00 in wages from **AWD**.

**c. Lisa Henry**

237. From at least on or about January 1, 2000 to on or about December 31, 2004, defendant **LISA HENRY** received monies under the guise of Form W-2 wages totaling approximately $188,574.20 and health insurance benefits from **AWD**, when in fact the defendant **LISA HENRY** provided no services to **AWD** as an employee.

238. In or about August, 1990 through July 19, 2005, defendant **LISA HENRY** was placed and maintained on **AWD's** payroll, even though defendant **LISA HENRY** did not work for **AWD**, an arrangement to which defendant **LISA HENRY** agreed.

239. On or about May 18, 2000, the defendant **LISA HENRY** signed an enrollment form for health insurance stating that she was employed by **AWD** as a sales person/public relations employee, when in fact she did not provide any services to **AWD** as an employee.

240. For example, on or about December 27, 2001, **JAMES GALANTE** signed payroll check Number 44275 drawn on an **AWD** account at People's Bank made payable to the defendant **LISA HENRY** in the amount of $501.19, when in fact the defendant **LISA HENRY** did not provide any services to **AWD** as an employee.

241. Further, on or about January 25, 2002, **JAMES GALANTE** signed payroll check Number 44624 drawn on an **AWD** account at People's Bank made payable to the defendant **LISA HENRY** in the amount of $509.58, when in fact the defendant **LISA HENRY** did not

provide any services to **AWD** as an employee.

242. On or before April 5, 2001, the defendant **LISA HENRY** did willfully make and subscribe a false 2000 U.S. Individual Income Tax Return, Form 1040, that falsely reported that she had earned $38,251.82 in wages from **AWD**.

243. On or before April 8, 2002, the defendant **LISA HENRY** did willfully make and subscribe a false 2001 U.S. Individual Income Tax Return, Form 1040, that falsely reported that she had earned $36,625.04 in wages from **AWD**.

244. On or before March 10, 2003, the defendant **LISA HENRY** did willfully make and subscribe a false 2002 U.S. Individual Income Tax Return, Form 1040, that falsely reported that she had earned $37,228.54 in wages from **AWD**.

245. On or before March 24, 2004, the defendant **LISA HENRY** did willfully make and subscribe a false 2003 U.S. Individual Income Tax Return, Form 1040A, that falsely reported that she had earned $37,878.40 in wages from **AWD**.

246. On or before February 26, 2005, the defendant **LISA HENRY** did willfully make and subscribe a false 2004 U.S. Individual Income Tax Return, Form 1040, that falsely reported that she had earned $38.590.40 in wages from **AWD**.

**d. Hockey Players**

247. As noted above, in or about 2004, **JAMES GALANTE** and others caused Hockey Players A, B and C to be placed on the payrolls of **DWD**, **DCC**, and **ARC**.

248. As alleged above, these Hockey Players received monies under the guise of wages from certain trash hauling companies operated by **JAMES GALANTE**, when in fact these hockey players provided no services to those entities.

249. On or about July, 30, 2004, and October 30, 2004 and January 30, 2005, **JAMES GALANTE, CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused a Form 941 quarterly employment tax returns to be filed on behalf of **DWD** that falsely characterized monies paid to the monies paid to Hockey Player A as wages.

250. On or about January 30, 2005, **JAMES GALANTE, CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused a Form 941 quarterly employment tax returns to be filed on behalf of **SWD** that falsely characterized monies paid to Hockey Player B as wages.

251. On or about July, 30, 2004, and October 30, 2004 and January 30, 2005, **JAMES GALANTE, CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused a Form 941 quarterly employment tax returns to be filed on behalf of **ARC** that falsely characterized monies paid to Hockey Player C as wages.

**e. Race Team**

252. On or about November 5, 2001, **JAMES GALANTE** caused Racing Team Member A to be added to the payroll of JAT as a Supervisor.

253. On or about November 5, 2001, **JAMES GALANTE** caused Racing Team Member B to be added to the payroll of **JAT** as a Supervisor.

254. On or about June 6, 2002, **JAMES GALANTE** caused Racing Team Member C to be added to the payroll of **JAT** as a Supervisor.

255. On or about October 7, 2002, **JAMES GALANTE** caused Racing Team Member D to be added to the payroll of **JAT** as a Supervisor.

256. In or about 1996, **JAMES GALANTE** caused Racing Team Member E to be added to the payroll of **AWD** as a maintenance employee.

257. During the period 2001 through and including 2005, **JAMES GALANTE** caused **JAT** to issue Form W-2 income to Racing Team Members A, B, C, D when in fact these individuals provided no services to **JAT**.

258. In the years 2001 through 2004, **JAMES GALANTE** caused **AWD** to issue Form W-2 income to Racing Team Member E, when in fact this individual provided no services to **AWD.**

259. For example, on or about February 1, 2002, **JAMES GALANTE** caused **JAT** to issue a paycheck number 35610 in the amount of $989.76 to Racing Team Member A, when in fact Racing Team Member A provided no services to **JAT**.

260. For example, on or about February 1, 2002, **JAMES GALANTE** caused **JAT** to issue a paycheck number 35609 in the amount of $709.26 to Racing Team Member B, when in fact Racing Team Member B provided no services to **JAT**.

261. For example, on or about November 1, 2002, **JAMES GALANTE** caused **JAT** to issue a paycheck number 37065 in the amount of $454.16 to Racing Team Member C, when in fact Racing Team Member C provided no services to **JAT**.

262. For example, on or about November 1, 2002, **JAMES GALANTE** caused **JAT** to issue a paycheck number 37066 in the amount of $814.82 to Racing Team Member D, when in fact Racing Team Member D provided no services to **JAT**.

263. As noted above, for the tax years 2000 through 2003, **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **AWD**, the parent company of **JAT**, to file corporate tax returns with the Internal Revenue Service These returns improperly deducted monies paid to Racing Team Members under the guise of wages.

**f. High School Hockey Coach**

264. On or about November 26, 2001, **JAMES GALANTE** caused Hockey Coach A to be added to the payroll of **AWD** as a salesperson, when in fact Hockey Coach A provided no services to **AWD**.

265. From on or about November 26, 2001 through and including 2003, **JAMES GALANTE** caused **AWD** to issue Form W-2 income to Hockey Coach A, when in fact Hockey Coach A provided no services to **AWD**.

266. For example, on or about August 30, 2002, **JAMES GALANTE** signed payroll check Number 46699 drawn on an **AWD** account at People's Bank made payable to Hockey Coach A in the amount of $327.56, when in fact Hockey Coach A did not provide any services to **AWD** as an employee.

267. For example, on or about September 27, 2002, **JAMES GALANTE** signed payroll check Number 46961 drawn on an **AWD** account at People's Bank made payable to Hockey Coach A in the amount of $327.56, when in fact Hockey Coach A did not provide any services to **AWD** as an employee.

**g. Form 941 Filings**

268. On or about April 30, 2004, **JAMES GALANTE, CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused a Form 941 quarterly employment tax return to be filed on behalf of **AWD,** that falsely characterized monies paid to Racing Team Members as wages.

269. On or about July 30, 2004, **JAMES GALANTE, CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused a Form 941 quarterly employment tax return to be filed on behalf of **AWD** that falsely characterized monies paid to, among others, **LISA HENRY**, **CARMINE**

**DOMINICUS, ANNA PRISKIE**, and Racing Team Members A, B, C and D as wages.

270. On or about October 30, 2004, **JAMES GALANTE, CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused Form 941 quarterly employment tax return to be filed on behalf of **AWD** that falsely characterized monies paid to, among others, **LISA HENRY, CARMINE DOMINICUS, ANNA PRISKIE**, and Racing Team Members A, B, C and D as wages.

271. On or about January 30, 2005, **JAMES GALANTE, CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused a Form 941 quarterly employment tax return to be filed on behalf of **AWD** that falsely characterized monies paid to, among others, **LISA HENRY, CARMINE DOMINICUS, ANNA PRISKIE**, and Racing Team Members A, B, C and D as wages.

**3. 530 Main Street**

272. As noted above, **JAMES GALANTE** and **CHRISTOPHER RAYNER** conspired to create and utilize **530 MAIN STREET** d.b.a. Nutmeg Investments to provide benefits to **HENRY**.

273. On or before September 19, 2001, the defendants **JAMES GALANTE, CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused **530 MAIN STREET** to willfully make, subscribe and cause to be filed a false 2000 U.S. Corporation Income Tax Return for an S Corporation, Form 1120S.

274. On or before September 20, 2002, the defendants **JAMES GALANTE** and **CHRISTOPHER RAYNER** caused **530 MAIN STREET d.b.a. Nutmeg Investments** to willfully make, subscribe and cause to be filed a false 2001 U.S. Corporation Income Tax Return for an S Corporation, Form 1120S.

275. On or before September 18, 2003, the defendants **JAMES GALANTE** and **CHRISTOPHER RAYNER** caused **530 MAIN STREET d.b.a. Nutmeg Investments** to willfully make, subscribe and cause to be filed a false 2002 U.S. Corporation Income Tax Return, Form 1120.

276. On or before September 20, 2004, the defendants **JAMES GALANTE** and **CHRISTOPHER RAYNER** caused **530 MAIN STREET d.b.a. Nutmeg Investments** to willfully make, subscribe and cause to be filed a false 2003 U.S. Corporation Income Tax Return, Form 1120.

**4. Cash Skim**

277. As noted above, for the years 2000-2003, **JAMES GALANTE** filed personal income tax returns, Form 1040. These returns were false, fictitious and fraudulent in that said returns, among other things, failed to report the cash income **JAMES GALANTE** received from **TSI** and **AWD**.

278. Further, as noted above, for the years 2000-2003, **JAMES GALANTE**, **CHRISTOPHER RAYNER** and **RONALD ZOLLO** caused both **AWD** and **TSI** to file corporate tax returns. These returns were false, fictitious and fraudulent in that said returns, among other things, failed to accurately report the full income generated by **AWD** and **TSI**.

279. During the period of time covered by this indictment, **JAMES GALANTE** and **ERIC ROMANDI** caused employees who received cash at the scale house located at 307 White Street in Danbury, Connecticut to maintain incomplete records of such cash received from customers. Specifically, certain employees were instructed not to permanently record either the customer's name or the date the cash was received on the designated form. Such instructions were designed

to prevent a full and accurate recording of the cash receipts generated by **TSI**.

280. Further, during the period of time covered by this indictment, **JAMES GALANTE** caused **ERIC ROMANDI** to go to the scale house located at 307 White Street on a regular basis and retrieve the cash collected by the scale house operator from the customers who paid in cash. **ERIC ROMANDI** took the cash from the scale house and caused a portion of these monies to be delivered to **JAMES GALANTE**.

281. Further, during the period of time covered by the Indictment, **JAMES GALANTE** caused a portion of the revenue derived from his trash hauling operation, including but not limited to a portion of the monies received from the bulk disposal operation controlled by **JAMES GALANTE**, to be delivered to him.

**5. Cash Kickbacks to Galante from Employee A and Romandi**

282. On or about November 22, 2002, **JAMES GALANTE** caused **THOMAS REFUSE** to issue paycheck number 10096 in the amount of $2956.50 to Employee A. Subsequently, Employee A cashed this check and caused approximately $2885.00 in United States currency to be delivered to **JAMES GALANTE** for his personal use.

283. On or about January 3, 2003, **JAMES GALANTE** caused **THOMAS REFUSE** to issue paycheck number 10351 in the amount of $2770.50 to Employee A. Subsequently, Employee A cashed this check and caused approximately $2885.00 in United States currency to be delivered to **JAMES GALANTE** for his personal use.

284. On or about August 16, 2002, **JAMES GALANTE** caused **ERIC ROMANDI** to receive three paychecks. **JAMES GALANTE** caused **AWD** to issue paycheck number 46563 in the amount of $746.67; **SWD** to issue paycheck number 3772 in the amount of 611.55, and

**DWD** to issue paycheck number 11943 in the amount of 611.55 to **ERIC ROMANDI**. Subsequently, **ERIC ROMANDI** cashed one or more of these paychecks and caused a portion of these proceeds to be delivered to **JAMES GALANTE** for his personal use.

285. As noted above, for the tax years 2000-2004, inclusive, **JAMES GALANTE** willfully made, subscribed and caused to be filed a false U.S. Individual Income Tax Returns, Form 1040. These returns were false, among other things, in that they failed to account for income that **JAMES GALANTE** received from Employee A and **ERIC ROMANDI**.

**6. Payments To Matthew Ianniello**

286. As described above, from in or about 2001 through and including in or about June, 2005, **JAMES GALANTE** caused sums of United States currency to be delivered to **MATTHEW IANNIELLO** on a periodic basis.

287. On or before April 15, 2002, the defendant **MATTHEW IANNIELLO** did willfully file a 2001 U.S. Individual Income Tax Return, Form 1040, and by so doing attempted to evade and defeat a large part of the income taxes owed by him to the United States of America for the calendar year 2001.

288. On or before October 1, 2003, the defendant **MATTHEW IANNIELLO** did willfully file a 2002 U.S. Individual Income Tax Return, Form 1040, and by so doing attempted to evade and defeat a large part of the income taxes owed by him to the United States of America for the calendar year 2002.

All in violation of 18 U.S.C. § 371.

**COUNT SIXTY-THREE**

26 U.S.C. § 7206(1): Galante's Personal Return (2000)

289. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

290. On or about April 13, 2001, in the District of Connecticut, **JAMES GALANTE**, the defendant herein, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2000, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant did not believe to be true and correct as to every material matter, in that he reported taxable income of $12,798,700.00, whereas, as he then and there well knew and believed, his taxable income was substantially higher because he failed to report a substantial amount of income that was derived from several sources, including but not limited to cash that he received from both Employee A and **ERIC ROMANDI**, income derived from improper expenses received from **AWD** and **TSI**, unreported cash generated by his businesses, and by falsely reporting his distributive share from **TSI** and **530 Main Street**.

All in violation of 26 U.S.C. § 7206(1).

**COUNT SIXTY-FOUR**

26 U.S.C. § 7206(1): Galante's Personal Return (2001)

291. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

292. On or about October 10, 2002, in the District of Connecticut, **JAMES GALANTE**, the defendant herein, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2001, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant did not believe to be true and correct as to every material matter, in that he reported

taxable income of $778,134.00, whereas, as he then and there well knew and believed, his taxable income was substantially higher because he failed to report a substantial amount of income that was derived from several sources, including but not limited to cash that he received from both Employee A and **ERIC ROMANDI**, income derived from improper expenses received from **AWD** and **TSI**, unreported cash generated by his businesses, and by falsely reporting his distributive share from **TSI** and **530 Main Street**.

All in violation of 26 U.S.C. § 7206(1).

**COUNT SIXTY-FIVE**
26 U.S.C. § 7206(1): Galante's Personal Return (2002)

293. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

294. On or about October 9, 2003, in the District of Connecticut, **JAMES GALANTE**, the defendant herein, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2002, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant did not believe to be true and correct as to every material matter, in that he reported taxable income of $1,505,968.00, whereas, as he then and there well knew and believed, his taxable income was substantially higher because he failed to report a substantial amount of income that was derived from several sources, including but not limited to cash that he received from both Employee A and **ERIC ROMANDI**, income derived from improper expenses received from **AWD** and **TSI**, unreported cash generated by his businesses, and by falsely reporting his distributive share from **TSI** and **530 Main Street**.

. All in violation of 26 U.S.C. § 7206(1).

**COUNT SIXTY-SIX**

26 U.S.C. § 7206(1): Galante's Personal Return (2003)

295. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

296. On or about July 2, 2004, in the District of Connecticut, **JAMES GALANTE**, the defendant herein, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2003, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant did not believe to be true and correct as to every material matter, in that he reported taxable income of $588,389.00, whereas, as he then and there well knew and believed, his taxable income was substantially higher because he failed to report a substantial amount of income that was derived from several sources, including but not limited to cash that he received from both Employee A and **ERIC ROMANDI**, income derived from improper expenses received from **AWD** and **TSI**, unreported cash generated by his businesses, and by falsely reporting his distributive share from **TSI** and **530 Main Street**.

All in violation of 26 U.S.C. § 7206(1).

**COUNT SIXTY-SEVEN**

26 U.S.C. § 7206(1): Galante's Personal Return (2004)

297. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

298. On or about October 17, 2005, in the District of Connecticut, **JAMES GALANTE**, the defendant herein, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2004, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant did not believe to be true and correct as to every material matter, in that he reported

taxable income of $623,347.00, whereas, as he then and there well knew and believed, his taxable income was substantially higher because he failed to report a substantial amount of income that was derived from several sources, including but not limited to cash that he received from both Employee A and **ERIC ROMANDI**, income derived from improper expenses received from **AWD** and **TSI**, unreported cash generated by his businesses, and by falsely reporting his distributive share from **TSI** and **530 Main Street**.

All in violation of 26 U.S.C. § 7206(1).

**COUNT SIXTY-EIGHT**
26 U.S.C. § 7206(1): Lisa Henry's Personal Return (2000)

299. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

300. On or about April 5, 2001, in the District of Connecticut, **LISA HENRY**, the defendant herein, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2000, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant did not believe to be true and correct as to every material matter, in that the return represented that she earned wage income in the amount of $38,252.00 from **AWD**, whereas, she then and there well knew and believed, that she had not earned any wage income from **AWD**.

All in violation of 26 U.S.C. § 7206(1).

**COUNT SIXTY-NINE**
26 U.S.C. § 7206(1): Lisa Henry's Personal Return (2001)

301. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

302. On or about April 8, 2002, **LISA HENRY**, in the District of Connecticut, the defendant herein, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for

the calendar year 2001, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant did not believe to be true and correct as to every material matter, in that the return represented that she earned wage income in the amount of $36,625.00 from **AWD**, whereas, she then and there well knew and believed, both that she had not earned any wage income from **AWD**

All in violation of 26 U.S.C. § 7206(1).

**COUNT SEVENTY**

26 U.S.C. § 7206(1): Lisa Henry's Personal Return (2002)

303. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

304. On or about March 10, 2003, in the District of Connecticut, **LISA HENRY,** the defendant herein, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2002, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant did not believe to be true and correct as to every material matter, in that the return represented that she earned wage income in the amount of $37,229.00 from **AWD**, whereas, she then and there well knew and believed, both that she had not earned any wage income from **AWD**.

All in violation of 26 U.S.C. § 7206(1).

**COUNT SEVENTY-ONE**

26 U.S.C. § 7206(1): Lisa Henry's Personal Return (2003)

305. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

306. On or about March 24, 2004, in the District of Connecticut, **LISA HENRY**, the defendant herein, did willfully make and subscribe a U.S. Individual Income Tax Return, Form

1040A, for the calendar year 2003, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant did not believe to be true and correct as to every material matter, in that the return represented that she earned wage income in the amount of $37,878.00 from **AWD**, whereas, she then and there well knew and believed, both that she had not earned any wage income from **AWD**.

All in violation of 26 U.S.C. § 7206(1).

**COUNT SEVENTY-TWO**
26 U.S.C. § 7206(1): Lisa Henry's Personal Return (2004)

307. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

308. On or about February 26, 2005, in the District of Connecticut, **LISA HENRY**, the defendant herein, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2004, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant did not believe to be true and correct as to every material matter, in that the return represented that she earned wage income in the amount of $38,590.00 from **AWD**, whereas, she then and there well knew and believed, both that she had not earned any wage income from **AWD**.

All in violation of 26 U.S.C. § 7206(1).

**COUNT SEVENTY-THREE**
26 U.S.C. § 7206(1): Anna Priskie's Personal Return (2000)

309. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

310. On or about July 1, 2001, **ANNA PRISKIE**, the defendant herein, in the Southern

District of New York, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2000, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant **ANNA PRISKIE** did not believe to be true and correct as to every material matter, in that the said return represented that defendant **ANNA PRISKIE,** earned wage income in the amount of $18,009.00 from **AWD**, whereas, defendant **ANNA PRISKIE** then and there well knew and believed, she had not earned any wage income from **AWD.**

All in violation of 26 U.S.C. § 7206(1).

**COUNT SEVENTY-FOUR**
26 U.S.C. § 7206(1): Anna Priskie's Personal Return (2001)

311. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

312. On or about September 9, 2002, **ANNA PRISKIE**, the defendant herein, did, in the Southern District of New York, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2001, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant **ANNA PRISKIE** did not believe to be true and correct as to every material matter, in that the said return represented that defendant **ANNA PRISKIE,** earned wage income in the amount of $18,285.00 from **AWD**, whereas, defendant **ANNA PRISKIE** then and there well knew and believed, she had not earned any wage income from **AWD.**

All in violation of 26 U.S.C. § 7206(1).

**COUNT SEVENTY-FIVE**
26 U.S.C. § 7206(1): Anna Priskie's Personal Return (2002)

313. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

314. On or about April 11, 2003, **ANNA PRISKIE**, the defendant herein, did, in the Southern District of New York, willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2002, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant **ANNA PRISKIE** did not believe to be true and correct as to every material matter, in that the said return represented that defendant **ANNA PRISKIE,** earned wage income in the amount of $17,940.00 from **AWD**, whereas, defendant **ANNA PRISKIE** then and there well knew and believed, she had not earned any wage income from **AWD.**

All in violation of 26 U.S.C. § 7206(1).

**COUNT SEVENTY-SIX**
26 U.S.C. § 7206(1): Anna Priskie's Personal Return (2003)

315. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

316. On or about September 15, 2005, **ANNA PRISKIE**, the defendant herein, did, in the Southern District of New York, willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2003, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant **ANNA PRISKIE** did not believe to be true and correct as to every material matter, in that the said return represented that defendant **ANNA PRISKIE,** earned wage income in the amount of $17,940 from **AWD**, whereas, defendant **ANNA PRISKIE** then and there well knew and believed, she had not earned any wage income from **AWD.**

All in violation of 26 U.S.C. § 7206(1).

**COUNT SEVENTY-SEVEN**
26 U.S.C. § 7206(1): Carmine Dominicus' Personal Return (2000)

317. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

318. On or about October 12, 2001, **CARMINE DOMINICUS**, the defendant herein, did, in the District of Connecticut, willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2000, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant **CARMINE DOMINICUS** did not believe to be true and correct as to every material matter, in that the said return represented that defendant **CARMINE DOMINICUS,** earned wage income in the amount of $18,009.00 from **AWD**, whereas, defendant **CARMINE DOMINICUS** then and there well knew and believed, he had not earned any wage income from **AWD.**

All in violation of 26 U.S.C. § 7206(1).

**COUNT SEVENTY-EIGHT**
26 U.S.C. § 7206(1): Carmine Dominicus' Personal Return (2001)

319. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

320. On or about April 8, 2002, **CARMINE DOMINICUS**, the defendant herein, did, in the District of Connecticut, willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2001, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant **CARMINE DOMINICUS** did not believe to be true and correct as to every material matter, in that the said return represented that defendant **CARMINE DOMINICUS,** earned wage income in the amount of $18,285.00 from **AWD**, whereas, defendant **CARMINE**

**DOMINICUS** then and there well knew and believed, he had not earned any wage income from **AWD.**

All in violation of 26 U.S.C. § 7206(1).

**COUNT SEVENTY-NINE**
26 U.S.C. § 7206(1): Carmine Dominicus' Personal Return (2002)

321. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

322. On or about March 19, 2003, **CARMINE DOMINICUS**, the defendant herein, did, in the District of Connecticut, willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2002, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant **CARMINE DOMINICUS** did not believe to be true and correct as to every material matter, in that the said return represented that defendant **CARMINE DOMINICUS,** earned wage income in the amount of $17,940.00 from **AWD**, whereas, defendant **CARMINE DOMINICUS** then and there well knew and believed, he had not earned any wage income from **AWD.**

All in violation of 26 U.S.C. § 7206(1).

**COUNT EIGHTY**
26 U.S.C. § 7206(1): Carmine Dominicus' Personal Return (2003)

323. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

324. On or about March 25, 2004, **CARMINE DOMINICUS**, the defendant herein, did, in the District of Connecticut, willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2003, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center,

which said defendant **CARMINE DOMINICUS** did not believe to be true and correct as to every material matter, in that the said return represented that defendant **CARMINE DOMINICUS,** earned wage income in the amount of $17,940.00 from **AWD**, whereas, defendant **CARMINE DOMINICUS** then and there well knew and believed, he had not earned any wage income from **AWD.**

All in violation of 26 U.S.C. § 7206(1).

**COUNT EIGHTY-ONE**
26 U.S.C. § 7206(1): Carmine Dominicus' Personal Return (2004)

325. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

326. On or about February 28, 2005, **CARMINE DOMINICUS**, the defendant herein, did, in the District of Connecticut, willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2004, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center, which said defendant **CARMINE DOMINICUS** did not believe to be true and correct as to every material matter, in that the said return represented that defendant **CARMINE DOMINICUS,** earned wage income in the amount of $18,285.00 from **AWD**, whereas, defendant **CARMINE DOMINICUS** then and there well knew and believed, he had not earned any wage income from **AWD.**

All in violation of 26 U.S.C. § 7206(1).

**COUNT EIGHTY-TWO**
26 U.S.C. § 7201: Tax Evasion Re: Matthew Ianniello's Personal Return (2001)

327. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

328. On or about April 15, 2002, in the District of Connecticut and elsewhere, defendant

**MATTHEW IANNIELLO** did willfully attempt to evade and defeat a large part of the income taxes owed by him to the United States of America for the calendar year 2001 by concealing receipt of monies from **JAMES GALANTE** and by subsequently signing and filing a false and fraudulent U.S. Income Tax Return, Form 1040, which was filed with the Internal Revenue Service, wherein it was stated that the taxable income for said calendar year was the sum of $613, whereas, as **IANNIELLO** then and there well knew and believed, the taxable income for the 2001 calendar year was the approximate sum of at least $210,827, upon which taxable income there was due and owing to the United States of America an income tax of approximately $68,363..

All in violation of 26 U.S.C. § 7201.

**COUNT EIGHTY-THREE**

26 U.S.C. § 7201: Tax Evasion Re: Matthew Ianniello's Personal Return (2002)

329. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

330. In or about September, 2003, the exact date being unknown to the Grand Jury, in the District of Connecticut and elsewhere, defendant **MATTHEW IANNIELLO**, did willfully attempt to evade and defeat a large part of the income taxes owed by him to the United States of America for the calendar year 2002 by concealing receipt of monies from **JAMES GALANTE** and by subsequently signing and filing a false and fraudulent U.S. Income Tax Return, Form 1040, which was filed with the Internal Revenue Service, wherein it was stated that there was no taxable income for said calendar year, whereas, as **IANNIELLO** then and there well knew and believed, the taxable income for the 2002 calendar year was the approximate sum of at least $66,625, upon which taxable income there was due and owing to the United States of America an

income tax of approximately $15,193.

All in violation of 26 U.S.C. § 7201.

**COUNT EIGHTY-FOUR**

26 U.S.C. § 7201: Tax Evasion Re: Matthew Ianniello's Personal Return (2003)

331. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

332. That during the calendar year 2003, in the District of Connecticut and elsewhere, defendant **MATTHEW IANNIELLO** had and received taxable income in the sum of approximately $128,920; that upon said taxable income there was owing to the United States of America an income tax of $33,266; that well knowing and believing the foregoing facts, **MATTHEW IANNIELLO**, on or about April 15, 2004, did willfully attempt to evade and defeat the said income tax due and owing by him to the United States of America for said calendar year by failing to make an income tax return on or before April 15, 2004, as required by law, to any proper officer of the Internal Revenue Service, by failing to pay to the Internal Revenue Service said income tax and attempting to conceal from all proper officers of the Internal Revenue Service his true and correct income by not reporting monies he had received from **JAMES GALANTE**.

All in violation of 26 U.S.C. § 7201.

**COUNT EIGHTY-FIVE**

26 U.S.C. § 7201: Tax Evasion Re: Matthew Ianniello's Personal Return (2004)

333. Paragraphs 150 through 288 are hereby realleged and incorporated by reference.

334. That during the calendar year 2004, in the District of Connecticut and elsewhere, defendant **MATTHEW IANNIELLO** had and received taxable income in the sum of approximately $96,620; that upon said taxable income there was owing to the United States of

America an income tax of $22,399; that well knowing and believing the foregoing facts, **MATTHEW IANNIELLO**, on or about April 15, 2005, did willfully attempt to evade and defeat the said income tax due and owing by him to the United States of America for said calendar year by failing to make an income tax return on or before April 15, 2004, as required by law, to any proper officer of the Internal Revenue Service, by failing to pay to the Internal Revenue Service said income tax and attempting to conceal from all proper officers of the Internal Revenue Service his true and correct income by not reporting monies he had received from **JAMES GALANTE**.

All in violation of 26 U.S.C. § 7201.

**COUNTS EIGHTY-SIX to NINETY-FOUR**

26 U.S.C. § 7206(1): Ronald Zollo re: Corporate Returns for AWD, TSI & 530 Main Street

335. Paragraphs 150 through 334 are hereby realleged and incorporated by reference.

336. On or about the dates set forth in the table below, in the District of Connecticut, **RONALD ZOLLO**, the defendant herein, did willfully, make and subscribe U.S. Corporate Income Tax Returns, which were verified by a written declaration that they were made under the penalties of perjury and were filed with the Internal Revenue Service Center, which said defendant **RONALD ZOLLO** did not believe to be true and correct as to every material matter, in that these returns contained improper deductions for employees and/or contained fraudulent deductions for expenses. Each false and fraudulent income tax return is set forth as a separate count of the Indictment, as indicated by the name of the corporate taxpayer, the tax year of the return, the corporate tax return that was filed, the date on or about when the defendant **RONALD ZOLLO** signed the return, and listing of, among other things, the false and fraudulent

information contained on the return.

| Count | Taxpayer | Tax Year | Form | Signed by Zollo on or about | False and Fraudulent Items |
|---|---|---|---|---|---|
| 86 | AWD | 2000 | 1120 | 9/12/01 | wage expenses, business expenses |
| 87 | AWD | 2001 | 1120 | 6/14/05 | wage expenses, business expenses |
| 88 | AWD | 2002 | 1120 | 9/15/03 | wage expenses, business expenses |
| 89 | AWD | 2003 | 1120s | 9/15/04 | wage expenses, business expenses |
| 90 | TSI | 2000 | 1120s | 9/12/01 | business expenses |
| 91 | TSI | 2001 | 1120s | 9/12/02 | business expenses |
| 92 | TSI | 2002 | 1120s | 9/12/03 | business expenses |
| 93 | TSI | 2003 | 1120s | 9/15/04 | business expenses |
| 94 | 530 Main Street | 2000 | 1120s | 4/12/01 | business expenses |

All in violation of 26 U.S.C. § 7206(1)

**COUNTS NINETY-FIVE to ONE HUNDRED SIX**

(aiding and assisting in filing of false return)

26 U.S.C. § 7206(2): Rayner & Galante re: Corporate Returns for AWD, TSI & 530 Main Street

337. Paragraphs 150 through 334 are hereby realleged and incorporated by reference.

338. On or about the dates set forth in the table below, in the District of Connecticut and elsewhere, **JAMES GALANTE** and **CHRISTOPHER RAYNER**, the defendants herein, did willfully aid and assist in, and procure, procure, counsel and advise the preparation and presentation to the Internal Revenue Service of U.S. Corporate Income Tax Returns, for the

corporate taxpayers and calendar years set or below that were, as set forth below, false and fraudulent as to material matters, in that these returns contained improper deductions for employees and/or contained fraudulent deductions for expenses, whereas the defendants **JAMES GALANTE** and **CHRISTOPHER RAYNER**, then and there knew and believed that said corporate taxpayers were not entitled to claim such expenses and deductions in those amounts. Each false and fraudulent income tax return is set forth as a separate count of the Indictment, as indicated by the name of the corporate taxpayer, the tax year of the return, the corporate tax return that was filed, the date on or about when the defendant **CHRISTOPHER RAYNER** signed the return, and listing of, among other things, the false and fraudulent information contained on the return.

| Count | Taxpayer | Tax Year | Form | Date Signed by Rayner | False and Fraudulent Items |
|---|---|---|---|---|---|
| 95 | AWD | 2000 | 1120 | 9/12/01 | wage expenses, business expenses |
| 96 | AWD | 2001 | 1120 | 6/14/05 | wage expenses, business expenses |
| 97 | AWD | 2002 | 1120 | 9/15/03 | wage expenses, business expenses |
| 98 | AWD | 2003 | 1120s | 9/15/04 | wage expenses, business expenses |
| 99 | TSI | 2000 | 1120s | 9/11/01 | business expenses |
| 100 | TSI | 2001 | 1120s | 9/12/02 | business expenses |
| 101 | TSI | 2002 | 1120s | 9/12/03 | business expenses |
| 102 | TSI | 2003 | 1120s | 9/15/04 | business expenses |
| 103 | 530 Main Street | 2000 | 1120s | 4/12/01 | business expenses |

| | | | | | |
|---|---|---|---|---|---|
| 104 | 530 Main Street | 2001 | 1120s | 9/10/02 | business expenses |
| 105 | 530 Main Street | 2002 | 1120 | 9/15/03 | business expenses |
| 106 | 530 Main Street | 2003 | 1120 | 9/15/04 | business expenses |

All in violation of 26 U.S.C. § 7206(2).

**COUNTS ONE HUNDRED SEVEN to ONE HUNDRED FIFTEEN**
(aiding and assisting in filing of false return)
26 U.S.C. § 7206(2): Rayner re: Personal Returns of Lisa Henry and James Galante

339. Paragraphs 150 through 334 are hereby realleged and incorporated by reference.

340. On or about the dates set forth in the table below, in the District of Connecticut and elsewhere, **CHRISTOPHER RAYNER**, the defendant herein, did willfully aid and assist in, and procure, procure, counsel and advise the preparation and presentation to the Internal Revenue Service of U.S. Personal Income Tax Returns, for the taxpayers and calendar years set for below that were, as set forth below, false and fraudulent as to material matters, in that these returns, among other things, either failed to accurately report the total taxable income attributable to the taxpayer or improperly reported the source of W-2 wage income that was reported, and the defendant **CHRISTOPHER RAYNER**, then and there knew and believed that said taxpayers either had additional unreported income or had not earned the income from the source reported to the Internal Revenue Service. Each false and fraudulent income tax return is set forth as a separate count of the Indictment, as indicated by the name of the taxpayer, the tax year of the return, the tax return that was filed, the date on or about when the defendant **CHRISTOPHER RAYNER** signed the return, and listing of, among other things, the false and fraudulent

information contained on the return.

| Count | Taxpayer | Tax Year | Form | Signed by Rayner on or about | False and Fraudulent Items |
|---|---|---|---|---|---|
| 107 | James Galante | 2000 | 1040 | 4/12/01 | understatement of income |
| 108 | James Galante | 2001 | 1040 | 9/10/02 | understatement of income |
| 109 | James Galante | 2002 | 1040 | 10/7/03 | understatement of income |
| 110 | James Galante | 2003 | 1040 | 7/2/04 | understatement of income |
| 111 | Lisa Henry | 2000 | 1040 | 4/4/01 | misstatement of source of income |
| 112 | Lisa Henry | 2001 | 1040 | 4/2/02 | misstatement of source of income |
| 113 | Lisa Henry | 2002 | 1040 | 3/10/03 | misstatement of source of income |
| 114 | Lisa Henry | 2003 | 1040A | 3/22/04 | misstatement of source of income |
| 115 | Lisa Henry | 2004 | 1040 | 2/21/04 | misstatement of source of income |

All in violation of 26 U.S.C. § 7206(2).

## COUNT ONE HUNDRED SIXTEEN (Structuring)

31 U.S.C. § 5324(a)

341. In or about October, 2001, in the District of Connecticut and elsewhere, **LISA HENRY**, the defendant herein, did knowingly and for the purpose of evading the reporting requirements of section 5313(a) of Title 31, United States Code, and the regulations promulgated thereunder, structure, assist in structuring, and attempt to structure or assist in structuring,

transactions with a domestic financial institution.

All in violation of Title 31, United States Code, Section 5324(a)(3), and Title 31, Code of Federal Regulations, Section 103.11.

______All in violation of 31 U.S.C. § 5324(a)

**COUNT ONE HUNDRED SEVENTEEN (Misuse of a Computer)**
18 U.S.C. § 1030(a)(2)(B) and (c)(2)(B)(ii)

On or about February 9, 2006, in the District of Connecticut and elsewhere, the defendant **LOUIS ANGIOLETTI**, who was then a Special Agent with the Drug Enforcement Administration, intentionally accessed a computer and exceeded his authorized access to that computer, and thereby obtained information from a department and agency of the United States, in furtherance of a criminal act in violation of the laws of the United States, to wit, an attempt to corruptly obstruct, influence and impede an official proceeding pursuant to Title 18, United States Code, Section 1512(c)(2).

All in violation of Title 18, United States Code, Sections 1030(a)(2)(B) and (c)(2)(B)(ii).

**FORFEITURE RELATING TO COUNTS ONE & TWO**
18 U.S.C. §§ 1963(a)(1), 1963(a)(3) and 1963(m)
(Racketeering / Racketeering Conspiracy)

342. The allegations contained in Counts One and Two of this indictment are hereby realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 in the event of any defendant's conviction under Counts One and Two of this

Indictment.

343. The defendants, **MATTHEW IANNIELLO, JAMES GALANTE, THOMAS MILO, CHRISTOPHER RAYNER, RICHARD GALIETTI, CIRO VIENTO, RICHARD CACCAVALE, JOSEPH SANTOPIETRO, PAUL DINARDO, ERIC ROMANDI, TIMOTHY ARCIOLA, DENNIS BOZZUTO, JASON MANAFORT, JEREMY EVERETT, ALAN FERRARO, DAVID MAGEL, SCOTT MCGOWAN, GARY MUELLER, ANTHONY NOVELLA III, ARTHUR WALLINGER, AWD, DWD, and SWD**:

a. have acquired and maintained interests in violation of Title 18, United States Code, § 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, § 1963(a)(1);

b. have an interest in, security of, claims against, and property and contractual rights which afford a source of influence over, the enterprise named and described herein which defendants established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, § 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, § 1963(a)(2); and

c. have property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, § 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, § 1963(a)(3).

344. The interests of defendants subject to forfeiture to the United States of America pursuant to Title 18, United States Code, § 1963(a)(1), (a)(2), and (a)(3), include but are not

limited to:

**Business Entities:**

a. Automated Waste Disposal (AWD); 307 White Street, Danbury, CT 06810

b. A & A Connecticut Waste System, LLC; 307 White Street, Danbury, CT 06810; and 54 Danbury Rd #302 Ridgefield, CT 06877

c. Acorn Equipment Leasing Corp.; 307 White Street, Danbury, CT 06810

d. Advanced Recycling Corp.; 307 White Street, Danbury, CT 06810

e. Advanced Waste Systems, Inc.; 307 White Street, Danbury, CT 06810; and P.O. Box 869, Southbury, CT 06488

f. American Disposal Services of CT (ADS); 307 White Street, Danbury, CT 06810; and 770 Derby Ave., Seymour, CT 06483

g. Danbury Carting Co.; 307 White Street, Danbury, CT 06810; and P.O. Box 153, West Redding, CT 06896

h. Diversified Waste Disposal, Inc (DWD); 307 White Street, Danbury, CT 06810; and 60 Newtown Road, Danbury, CT 06810

i. Eco-Fuel Services, Inc.; 307 White Street, Danbury, CT 06810

j. Environmental Systems, Inc.; 307 White Street, Danbury, CT 06810

k. F & H Sanitation Corp.; 307 White Street, Danbury, CT 06810

l. Greensphere, Inc.; 307 White Street, Danbury, CT 06810

m. J.A.T. Truck Repair Service, Inc.; 307 White Street, Danbury, CT 06810

n. New Fairfield Sanitation; 307 White Street, Danbury, CT 06810; 10 Weldon Woods Rd., New Fairfield, CT 06812; P.O. Box 8878, New Fairfield, CT 06812

o. New York-Connecticut Waste Recycling, Inc.; 307 White Street, Danbury, CT 06810; and 524 Waverly Ave., Mamaroneck, NY 10543

p. Northeastern Waste Management; 307 White Street, Danbury, CT 06810; and P.O. Box 367, Brewster, NY 10509

q. P & G Sanitation, Inc.; 307 White Street, Danbury, CT 06810; and P.O. Box 8852, New Fairfield, CT 06812

r. Recycling Technologies, Inc.; 307 White Street, Danbury, CT 06810

s. Saniclean Systems, Inc.; 307 White Street, Danbury, CT 06810

t. Southbury Waste Disposal, Inc.; 307 White Street, Danbury, CT 06810

u. Superior Leasing; 307 White Street, Danbury, CT 06810

v. Superior Waste Disposal, Inc.; 307 White Street, Danbury, CT 06810

w. Thomas Refuse Service; 307 White Street, Danbury, CT 06810; and P.O. Box 3679, Danbury, CT 06813

x. Transfer System, Inc.; 307 White Street, Danbury, CT 06810

y. 307 White Street Corp.; 307 White Street, Danbury, CT 06810

**Real Property:**

z. Certain real property located at 530 Main Street North, Southbury, CT 06488, more fully described on Attachment A to the Indictment

aa. An interest up the amount of $176,000 in certain real property located at 61 North Mountain Road, Brookfield, CT 06804, more fully described on Attachment B to the Indictment

**Financial Accounts:**

bb. A. G. Edwards & Sons account no. XXXXX5649 held in the name of James E. Galante

cc. A. G. Edwards & Sons account no. XXXXX5874 held in the name of James E. Galante

dd. A. G. Edwards & Sons account no. XXXXX5865 held in the name of James. E. Galante

ee. A. G. Edwards & Sons account no. XXXXX5883 held in the name of Roseanne Galante

ff. A. G. Edwards & Sons account no. XXXXX5989 held in the name of Roseanne Galante

gg. A. G. Edwards & Sons account no. XXXXX5690 held in the name of Roseanne Galante

hh. A. G. Edwards & Sons account no. XXXXX5951 held in the name of Roseanne Galante

ii. A. G. Edwards & Sons account no. XXXXX5987 held in the name of Roseanne Galante

jj. A. G. Edwards & Sons account no. XXXXX5843 held in the name of Roseanne Galante

kk. A. G. Edwards & Sons account no. XXXXX5933 held in the name of Roseanne Galante

ll. A. G. Edwards & Sons account no. XXXXX5717 held in the name of Roseanne Galante

mm. A. G. Edwards & Sons account no. XXXXX5757 held in the name of Roseanne Galante

nn. A. G. Edwards & Sons account no. XXXXX6086 held in the name of Roseanne Galante, C/F A.G.

oo. A. G. Edwards & Sons account no. XXXXX6126 held in the name of Roseanne Galante, C/F A.G.

pp. A. G. Edwards & Sons account no. XXXXX6030 held in the name of James E. Galante & Roseanne Galante

qq. A. G. Edwards & Sons account no. XXXXX5946 held in the name of A G Edwards & Sons, C/F A.G.

rr. A. G. Edwards & Sons account no. XXXXX5928 held in the name of A G Edwards & Sons, C/F C.G.

ss. A. G. Edwards & Sons account no. XXXXX6068 held in the name of Roseanne Galante, C/F C.G.

tt. A. G. Edwards & Sons account no. XXXXX6099 held in the name of Roseanne

Galante, C/F C.G.

uu. Savings Bank of Danbury account no. XXXX5910 held in the name of James E. Galante

vv. New Mil Bank money market account no. XXXXXX1793 held in the name of Roseanne Galante

ww. New Mil Bank savings account no. XXXXXX2331 held in the name of Roseanne Galante

xx. New Mil Bank checking account no. XXXXX4382 held in the name of Roseanne Galante

**Vehicles:**

yy. Six racing cars that compete under the name of "Mystique Motor Sports," marked with identifying numbers "01" through "06," respectively, on the front frame rails, all of which cars are ordinarily stored at Mystique Motor Sports's race shop, located at 60 South Canal Street, Plainville, CT

**Currency:**

zz. Approximately $448,153.10 in United States currency, seized on or about July 19, 2005, from both James E. Galante's business office at 307 White Street, Danbury, CT 06810, and James E. Galante's home at 10 Weldon Woods Road, New Fairfield, CT 06812

**Money Judgment:**

aaa. A sum of money equal to all interests, securities, claims, properties, contractual rights, and proceeds forfeitable under 18 U.S.C. § 1963(a)(1)-(3)

345. If any of the property described above as a result of any act or omission of any defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred, sold to, or deposited with a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

It is the intent of the United States, pursuant to Title 18, United States Code, § 1963(m), to seek forfeiture of any other property of said defendants up to the value of any property described in paragraph three above.

346. The above-named defendants, and each of them, are jointly and severally liable for the forfeiture obligations as alleged above.

All pursuant to Title 18, United States Code, § 1963.

**FORFEITURE RELATING TO COUNT ONE HUNDRED SEVENTEEN**
(Structuring)

347. Upon conviction of the offense alleged in Count One Hundred Seventeen of this Indictment, defendant **LISA A. HENRY** shall forfeit to the United States, pursuant to 31 U.S.C. § 5317(c)(1), all property, real and personal, involved in the offense, and any property traceable thereto, including but not limited to the following:

a. An interest up to the amount of $23,500 in A. G. Edwards & Sons account no. XXXXX4524 held in the name of Lisa A. Henry.

b. A sum of money equal to $23,500 in United States currency, representing the amount of money involved in the structuring offense.

348. If any of the above-described forfeitable property, as a result of any act or omission of the defendants, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as

incorporated by 31 U.S.C. § 5317(c)(1)(B), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

All in accordance with Title 31 United States Code, Section 5332.

A TRUE BILL

______________________________
FOREPERSON

UNITED STATES OF AMERICA

______________________________
KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

______________________________
MICHAEL J. GUSTAFSON
CHIEF, STRIKE FORCE

______________________________
RAYMOND F. MILLER
ASSISTANT UNITED STATES ATTORNEY

______________________________
ANTHONY E. KAPLAN
SUPERVISORY ASSISTANT UNITED STATES ATTORNEY

______________________________
HENRY K. KOPEL
ASSISTANT UNITED STATES ATTORNEY

ATTACHMENT A

530 Main Street North, Southbury, CT 06488

All that certain piece or parcel of land situated in the Town of Southbury, County of New Haven and State of Connecticut being shown and designated as Lot 3B Area 5.8038 Ac. on a certain map entitled: "Resubdivision of Lot No. 3 Subdivision of Land of the Estate of Edward Hinman, Jr. Main Street North Southbury, Connecticut, dated 10/26/95" which said map is on file in the office of the Town Clerk of Southbury as Map No. 3284.

All those certain pieces or parcels of land, together with the buildings located thereon, situated in the Town of Southbury, County of New Haven and State of Connecticut, situated on the easterly side of Main Street North, being shown and designated as Lots 2B and 2C on a certain map entitled, "Resubdivision of Lot No. 2 Subdivision of Land of the Estate of Edward Hinman, Jr., Southbury, Connecticut" which map is dated 3/29/90, was last revised 2/18/92, and is on file in the office of the Town Clerk of said Town of Southbury as Map No. 2955, to which reference may be had for a more particular description.

ATTACHMENT B

61 North Mountain Road, Brookfield, CT 06804

ALL THAT CERTAIN piece or parcel of land, with the buildings and improvements thereon situated in the Town of Brookfield, County of Fairfield and State of Connecticut shown and designated as Lot C-2 containing 150, 242 S.F., 3.449 Ac. on a certain map entitled “Map Prepared for Antonio Custodio Parcel “C” Lot 1 & Lot 2 North Mountain Road, Brookfield, Connecticut Scale 1"=40', Date June 18, 1986" which map is on file with the Town Clerk of Brookfield in Map Book 27 at page 22.

Said premises are conveyed with such rights of access to the waters of Lake Candlewood as contained in a deed recorded in Volume 25 at Page 519 of the Brookfield Land Records.